TEXAS MEDICAL ASSOCIATION, et al., Plaintiffs–Appellees,

v.

Louis W. SULLIVAN, M.D., Secretary of Health and Human Services, et al., Defendants–Appellants.

No. 87–1970.

United States Court of Appeals, Fifth Circuit.

June 27, 1989.

Rehearing Denied July 27, 1989.

Robert M. Roller, Kathryn E. Allen, Austin, Tex., for Blue Cross & Blue Shield.

Katherine L. Smith, Charlene Seifert, Asst. U.S. Attys., Austin, Tex., for Sullivan.

Douglas J. Colton, Washington, D.C., Phyllis Berkelman Schunck, Wood, Luck-

singer & Epstein, Austin, Tex., Gary W. Eiland, Houston, Tex., Donald J. Wilcox, Samuel V. Stone, Jr., Austin, Tex., for plaintiffs-appellees.

Before CLARK, BROWN and JOLLY, Circuit Judges.

JOHN R. BROWN, Circuit Judge:

This case is an interlocutory appeal, 28 U.S.C. § 1292(a)(1), of a preliminary injunction prohibiting Blue Cross and Blue Shield of Texas (BCBST) and the Secretary of Health and Human Services (Secretary) from recovering alleged overpayments made to doctors and patients under the Medicare (Part B) program. 42 U.S.C. §§ 1395j–1395w. Since we conclude 42 U.S.C. § 1395ff precludes judicial review, we vacate the preliminary injunction and remand to dismiss the case for lack of subject matter jurisdiction.

### Patient's Medical History

BCBST is a private health insurance carrier which contracted with the Health Care Financing Administration (HCFA), a division of the United States Department of Health and Human Services, to administer the Medicare (Part B) program in Texas. As a carrier, Blue Cross determines the "reasonable charge" for services paid for by Medicare. The "reasonable charge" constitutes the maximum amount Medicare pays for a given medical or health service. In computing the reasonable charge for a medical service, BCBST must use criteria set forth by statute, regulations and the Medicare Carriers' Manual. 42 U.S.C. § 1395u(b)(3); 42 C.F.R. § 405.501 et seq.; Medicare Carrier Manual (MCM) § 5000 et seq., in 1 Medicare & Medicaid Guide (CCH) §§ 3185–3400.

In the application of these criteria, the reasonable charge for a service is generally the *lowest* of (a) physician's actual, billed charge for the service, or (b) the physician's "customary charge" for similar services determined by the physician's fee profile developed by the local Medicare carrier, and (c) the locally "prevailing charge recognized by the carrier" for similar services provided by doctors to Medicare beneficiaries. 42 U.S.C. § 1395u(b)(3). The regulations set forth in greater detail the criteria to be used in arriving at reasonable charges and allows for consideration of unspecified factors to avoid grossly deficient or excessive charges. *See generally* 42 C.F.R. §§ 405.502–.511.

In the course of determining either a physician's "customary charge" or the local "prevailing charge", BCBST originally used local numerical codes to describe medical procedures and services. These codes enable data used to establish the various charges to be computerized. However, in July 1985, BCBST was required by HCFA to switch from its local numerical codes to a national code system called the HCFA Common Procedure Coding System (HCPCS). This conversion required data for the old 4–digit codes to be transferred or cross-walked by computer to the new 5–digit HCPCS code. This complex task of cross-walking historical customary and prevailing charge data—required to determine the reasonable charge for a medical procedure—to the HCPCS was further complicated by the existence of a Congressional freeze on customary and prevailing charge levels between July 1984 and January 1987.[1] Given the freeze, BCBST had to make sure that the conversion to the new HCPCS codes did not result in an inadvertent increase in the reasonable charges for the recorded medical procedures.

### Symptoms

BCBST successfully converted codes and cross-walked customary and prevailing

---

**1.** Deficit Reduction Act of 1984, Pub.L. No. 98–369, § 2306, 42 U.S.C. § 1395u(b)(4). Congress extended until March 1, 1986, the freeze on the actual charge of nonparticipating physicians and on the "prevailing" and "customary" charge levels for Medicare reimbursement. Emergen-

cy Extension Act of 1985, Pub.L. No. 99–107, § 5(b), 99 Stat. 479, amended by Pub.L. No. 99–155, § 2(d), 99 Stat. 814 and Pub.L. No. 99–201, § 2, 99 Stat. 1665. Thus, the freeze was in effect during the time period in which the overpayment occurred.

charge data for all but 18 medical procedures. BCBST had the data to convert these 18 codes, but the data was not immediately retrievable by the BCBST computer system. In response to physician complaints about underpayments for those 18 procedures, BCBST, without HCFA knowledge or approval, opted to set the fees for the 18 HCPCS codes at the highest prevailing rate in the state for each specific procedure or service. Therefore, between July 1985 and April 1986, BCBST payments for these 18 procedures did not reflect valid existing, albeit irretrievable, customary and prevailing charge data as required by HCFA in § 5020 of its Carrier Manual, and set forth by 42 U.S.C. § 1395u(b)(3) and 42 C.F.R. § 405.502. The need for valid customary and prevailing data to be reflected in the new HCPCS codes is best exemplified by 42 C.F.R. § 405.507's illustrations of the application of the criteria for determining reasonable charges.[2]

HCFA learned in October–November 1985 that physician payments on certain codes exceeded the amount paid before the conversion to HCPCS codes. A December 1985 HCFA review determined that the 18 procedure codes for which BCBST was using statewide rates were the source of the overpayments. A January 22, 1986 letter from HCFA informed BCBST that the pricing of the 18 codes was incorrect and that

it should reinstate valid customary and prevailing data which had been used prior to the conversion to the new codes. *See* Appendix A. It also requested BCBST to submit a plan informing HCFA of the date by which the valid customary and prevailing charge data would be loaded into the procedure codes. By April 1, 1986, the BCBST computers had matched the customary and prevailing charge data with the 18 new procedure codes. The statewide fee which BCBST had earlier "set" for the codes was replaced by reasonable charges BCBST calculated using the newly retrieved customary and prevailing charge data. BCBST did not consult HCFA [3] nor otherwise attempt to go back to using a set statewide fee for the 18 codes.[4]

### Take Two Aspirin and Call Me in the Morning

HCFA was less decisive with respect to deciding whether an effort should be made to recover the overpayments to physicians and their patients (beneficiaries) under the 18 procedure codes. On the basis of BCBST's January 1987 estimate of the total overpayment, HCFA initially decided not to spend an estimated $1.8 million to rerun the computer history of the payments to determine the actual dollar amount of the overpayment.[5] Physicians

2. The following hypothetical illustration is provided by 42 C.F.R. § 405.507:

The prevailing charge for a specific medical procedure ranges from $80 to $100 in a certain locality.

Doctor A's bill is for $75 although he customarily charges $80 for the procedure.

Doctor B's bill is his customary charge of $85 Doctor C's bill is his customary charge of $125 Doctor D's bill is for $100, although he customarily charges $80, and there are no special circumstances in the case.

The reasonable charge for Doctor A would be limited to $75 since under the law the reasonable charge cannot exceed the actual charge, even if it is lower than his customary charge and below the prevailing charges for the locality.

The reasonable charge for Doctor B would be $85, because it is his customary charge and it falls within the range of prevailing charges for that locality.

The reasonable charge for Doctor C could not be more than $100, the top of the range of prevailing charges.

The reasonable charge for Doctor D would be $80, because that is his customary charge. Even though his actual charge of $100 falls within the range of prevailing charges, the reasonable charge cannot exceed his customary charge in the absence of special circumstances.

3. The January 22, 1986 letter stated that BCBST should first "consult" before setting fees when valid customary and prevailing data was available.

4. The set statewide fees were merely a stop-gap measure enabling BCBST to keep payments up to date for the 18 codes while BCBST developed the systems capability to enable its computer to transfer or cross-walk the existing but irretrievable customary and prevailing charge data to the 18 new HCPCS procedure codes.

5. "[I]f the aggregate administrative expense of identifying and collecting a group of overpayments is more than can be reasonably expected to be collected, no action need be taken."

consequently were led to believe no refunds would be sought.[6] A later determination that the expense of rerunning the computer history would be less than originally anticipated[7] and the overpayment was larger than originally estimated, resulted in HCFA asking BCBST to rerun the payment history of the approximately 440,000 claims submitted under the codes.

The results on reprocessing showed that the total potential recovery (excluding overpayments of less than $50.00[8]), totalled $13.3 million which was paid to some 5,125 physicians and almost 15,000 beneficiaries. Once the magnitude of the overpayment became apparent, HCFA directed BCBST to institute recoupment efforts.[9]

### Curing the Illness But Losing the Patient?

BCBST sent letters requesting repayment of the overpayments to physicians and patients who had received Medicare funds under the 18 procedure codes. These demand letters, apparently mailed in August 1987, gave the recipients the option to pay in a lump sum or installments. Beneficiaries, but not physicians, were advised that they could apply for a waiver of liability if they were without fault in causing the overpayment and repayment would create a financial hardship. All recipients, physicians and beneficiaries, were advised of their right to contest the determination that they had been overpaid at an administrative hearing. The hearing process was fully described. Finally, if neither payment was made nor a response given to the

refund letter, all recipients were informed that the matter would be referred to HCFA or the Social Security Administration, respectively. Beneficiaries were informed that failure to pay could result in payments being taken from their Social Security checks. Physicians were informed that offsets could be made from Medicare payments due them for other services provided in the past or future.

In mid-September 1987, BCBST informed the overpaid physicians by letter (from the "Overpayment Project, Accounts Receivable Department") that they had been granted an additional 30 days in which to either pay the overpayment without interest or request a repayment schedule. Given this extension and the time span of mailing dates, no offsets against Medicare money due the provider physicians were to be made until November 2, 1987.[10]

Needless to say, the demand letters came as quite a surprise to the physicians who had previously been informed in Medicare Newsletters that no effort would be made to recover the overpayments. Even more bewildered were the patient beneficiaries who first learned of the overpayment upon receipt of repayment demand letters.

### Seeking a Second Opinion

On October 16, 1987, a group of physicians and Medicare beneficiaries filed this class action against the Secretary and BCBST. The putative classes[11] sought a temporary order and a preliminary injunction to halt further implementation of the

Affidavit of Jerry D. Sconce, HCFA Regional Administrator. R. 296.

**6.** Medicare Newsletter No. 49 (March 1986) and Medicare Newsletter No. 226 (August 1986) informed physicians of the switch from a set fee to use of customary and prevailing charge data and stated that "adjustments and/or overpayment requests will not be recognized by the carrier."

**7.** Less than $300,000, as opposed to the original figure of $1.8 million.

**8.** The carrier, BCBST, recovers only those overpayments which excede $50.00. MCM § 7120.2; 2 Medicare & Medicaid Guide (CCH) ¶ 11,255.

**9.** The demand letters sent by BCBST to the physicians stated that BCBST had been instructed by HCFA to recover the overpayments.

**10.** Due to complexities of the administrative process, deductions from beneficiaries' Social Security checks would be delayed well beyond November 2, 1987.

**11.** No classes have been certified to date. The putative classes described are "nonassigned repaid beneficiaries" "nonassigned beneficiaries," "nonassigned physicians," and "assigned repaid physicians." For ease of reference, we will refer to the plaintiffs as either the class or TMA (Texas Medical Association), which obviously is carrying the principal burden of this litigation.

plan to recover the overpayments. The class request for a temporary order was denied but after briefing and extensive oral argument on October 29, 1987, the trial court granted a preliminary injunction on November 2, 1987, *Texas Medical Ass'n v. Bowen,* 678 F.Supp. 643 (W.D.Tex.1987), from which the Secretary and BCBST now appeal.[12]

### Can We Ease the Pain?

The Secretary contends that the trial court erred in granting the preliminary injunction because it lacks subject matter jurisdiction.[13] The Secretary first urges that before resorting to federal court, all administrative remedies must be exhausted. Nonetheless, even if these remedies had been exhausted, 42 U.S.C. § 1395ff precludes judicial review of the administrative determinations which would have been rendered on the issues raised in this action. Since the first argument becomes subsumed in the second, our review commences with the availability of judicial review.

**12.** After the filing of this appeal, the trial court dismissed BCBST on the grounds that it was not a real party and interest. TMA has requested that BCBST be dismissed from this appeal. In response to BCBST's argument that the trial court order of dismissal is not final, TMA by letter stipulated that it waives any right to seek vacation or modification of the order. Even if we determined that BCBST's appeal is moot, we would nonetheless permit the Secretary to adopt BCBST's arguments as advanced in all briefs and at oral argument. Since the dismissal is before us and the stipulation of TMA cannot foreclose judicial consideration, we will continue to treat BCBST as a party to this appeal for no goal of judicial economy would be served by dismissal at this time, nor do we find any prejudice to TMA.

**13.** The Secretary and BCBST also argue that TMA has failed to satisfy the requirements set forth in *Lindsay v. City of San Antonio,* 821 F.2d 1103, 1105 (5th Cir.1987) for issuance of a preliminary injunction. Given our resolution of the jurisdictional issues raised, we need not reach the merits of the issuance of the preliminary injunction.

**14.** 42 U.S.C. § 1395 *et seq.*

**15.** Prior to amendment in 1986, 42 U.S.C. § 1395ff provided in pertinent part:

In granting rights to Medicare reimbursement for medical and health care items and services,[14] Congress expressly limited judicial review of payment disputes arising under these Medicare provisions. Specifically, § 1869 of the Social Security Act (SSA), 42 U.S.C. § 1395ff,[15] provides that entitlement to benefits, eligibility to enroll for benefits and fulfillment of the requirements for enrollment are the only issues pertinent to Medicare Part B provisions entitled to judicial review. Congress opted to rely on carrier "fair hearing" officers (HOs) to provide final Part B benefit determinations in lieu of judicial review.[16] Only after the 1986 Amendment to § 1395ff(b)[17] were payment disputes over items and services added to § 1395ff(b)'s list of judicially reviewable Medicare Part B matters. Yet, since all of the overpayment claims at issue arose prior to the 1987 effective date of the 1986 Amendment, the statutory enlargement of judicial review under § 1395ff(b) does not apply to the instant case.

The Supreme Court first tackled the scope of judicial review under § 1395ff(b)

(a) The determination of whether an individual is entitled to benefits under Part A or Part B of this subchapter, and a determination of the amount of benefits under Part A of the subchapter, shall be made by the Secretary in accordance with regulations prescribed by him.
(b)(1) Any individual dissatisfied with any determination under subsection (1) of this section as to—
(A) whether he meets the conditions of [entitlement to benefits] or
(B) whether he is eligible to enroll and has enrolled pursuant to Part B of this subchapter ..., or
(C) the amounts of benefits under Part A of this subchapter ...
shall be entitled to a hearing thereon by the Secretary to the extent as is provided in § 405(b) of this title and to judicial review of the Secretary's final decision after such hearing is provided in § 405(g) of this title.

**16.** The use of quasi-judicial hearing officers for these final benefit determinations has passed constitutional scrutiny. *Schweiker v. McClure,* 456 U.S. 188, 195–200, 102 S.Ct. 1665, 1669–1672, 72 L.Ed.2d 1, 7–11 (1982).

**17.** Omnibus Budget Reconciliation Act of 1986, Pub.L. 99–509, § 9313(a)(1)(B), 100 Stat. 1874, 2002–03 (1986).

in *United States v. Erika, Inc.*, 456 U.S. 201, 102 S.Ct. 1650, 72 L.Ed.2d 12 (1982). In *Erika* the Court held that § 1395ff precluded judicial review of a carrier's interpretation and application of the statutory and regulatory "reasonable charge" provisions in determining the "amount of benefits" payable under Part B of the Medicare program.

Later in *Bowen v. Michigan Academy of Family Physicians*, 476 U.S. 667, 106 S.Ct. 2133, 90 L.Ed.2d 623 (1986), the Court considered the question of judicial review of a Part B regulation, and specifically a challenge as to the "method" by which amounts of benefits are to be determined. In holding that challenges to the validity of the Secretary's instructions and regulations were not insulated from judicial review under § 1395ff, the Court carefully distinguished *Michigan Academy* from *Erika*. Whereas *Erika* was a judicially unreviewable challenge to the actual determination of the *amount* to be paid, the Court found the challenge in *Michigan Academy* subject to judicial review because it involved a challenge to the *methodology* by which amounts of benefit payments are determined. 476 U.S. at 675–78, 106 S.Ct. at 2138–40, 90 L.Ed.2d at 631–33. The *Michigan Academy* Court further explained challenges to methodology or the Secretary's instructions and regulations are not insulated from judicial review because "Congress did *not* leave [those matters] to be determined in a 'fair hearing' conducted by the carrier." *Id.* at 678, 106 S.Ct. at 2140, 90 L.Ed.2d at 633.

A hearing officer (HO) must comply with Title 18 of the SSA and subsequently issued regulations, as well as with HCFA "policy statements, instructions and other guides" issued pursuant to contracts between the Secretary and carriers. 42 C.F.R. § 405.8670. The Medicare Carrier's Manual, a "guide" for purposes of § 405.8670, makes this clear by providing that an HO may not overrule or interpret legal provisions "in a way different than HCFA does when he disagrees with their

intent." MCM § 12016 (1985). While both HOs and federal judges (be they Article I or Article III) are bound by the law and *valid* regulations, a HO cannot decide that a regulation or "instruction"/interpretation which is part and parcel of the Secretary's regulatory scheme is invalid. Such questions of validity *Michigan Academy* recognizes as the sole province of federal judges.

Given this circumscription of the HO's review powers, TMA claims that the Secretary through HCFA has retroactively and inconsistently declared a long-used payment method (the set statewide fees) illegal and has ordered BCBST to reopen and recalculate the claims under a different method, namely using the customary and prevailing data leaving open for independent decision only the dollar amount of overpayment. According to TMA, the issue of a given payment method's legality requires a review of the Secretary's instructions, and consequently is within the district court's jurisdiction under *Michigan Academy*.

The trial court in determining it had jurisdiction to issue a preliminary injunction, grappled with the amount/methodology distinction and decided that at the heart of the controversy TMA was challenging the legality of a methodology (set statewide fees) for determining reasonable charges for the 18 procedure codes. 678 F.Supp. 643. The trial court focused directly on this: "[t]his dispute centers upon whether the statewide fee schedule was a proper or improper payment methodology." The trial court, however, failed to transcend the semantics of the amount/methodology distinction. It is crucial to go beyond semantics because all challenges to Part B benefit determinations can be recast as reviewable challenges to methodology since all awards of Part B benefits or payments are based on a method of calculation. To separate the grist from the chaff and method from amount, we must determine whether the challenge is to the validity of a rule, regulation, or instruction of the Secretary[18] or merely a claim that BCBST "misapplied or misinterpreted valid rules and

---

**18.** *E.g., Linoz v. Heckler,* 800 F.2d 871 (9th Cir. 1986); *Integrated Generics, Inc. v. Bowen,* 678

F.Supp. 1004 (E.D.N.Y.1988).

regulations."[19] The amount/methodology distinction really boils down to a "distinction between the rules, regulations and statutes setting forth the proper computation method[20] and the carrier's applications of those provisions in determining the benefits owed." *Kuritzky v. Blue Shield of Western New York, Inc.*, 850 F.2d at 128 (citing *Michigan Academy,* 476 U.S. at 675–76, 106 S.Ct. at 2138–39, 90 L.Ed.2d at 631–32).

We are left to determine whether HCFA's directions to BCBST regarding the 18 new procedure codes (the transfer of valid customary and prevailing charge data and BCBST overpayments based on the set statewide fees) constitute judicially reviewable instructions or regulations of the Secretary. *Michigan Academy* and its progeny require that we assess whether an HO has the capacity to independently—free of binding regulations and determinations of the Secretary and subordinates—to hear and decide TMA's complaints deriving from BCBST's (i) replacement of set statewide fees for the 18 codes with fee profiles which reflect valid customary and prevailing charge data, and (ii) effort to recoup overpayments made to physicians and patients while set statewide fees were used since the customary and prevailing charge data could not be retrieved by BCBST's computers.

*Data Transfusion: Injecting Customary and Prevailing Data*

(i) Statewide Fee–"itis"

■ TMA claims that HCFA has declared the set statewide fees BCBST initially used for the 18 procedure codes illegal and instructed BCBST to cease using them. The only communication in the record between HCFA and BCBST which involves the propriety of setting statewide fees for the 18 procedure codes is the January 22, 1986 letter from the Chief of the Policy and Technical Assistance Branch of HCFA to the BCBST Medicare Division Manager. *See* Appendix A. That letter explained the purpose of HCFA's review of BCBST's fee setting process, and instructed BCBST to correct various procedure codes. Specifically, BCBST was told to "remove" the statewide set fees and to "reinstate" the valid customary and prevailing charge data which had been utilized before the conversion to the new 5–digit HCPCS codes.[21] The letter requested BCBST to submit a "corrected action plan" advising HCFA by what date valid customary and prevailing data would be reinstated. Finally, BCBST was advised that when it decided to set fees[22] in the future, if customary and prevailing data was available, BCBST should first consult with HCFA staff in the Regional Office.

The instructions[23] attached to this letter in many instances told BCBST to finish the job of converting data from the old 4–digit codes to the new 5–digit HCPCS codes. While for the most part these instructions requested BCBST to "eliminate" the set statewide fees, contrary to TMA's assertions, nowhere in the correspondence (Appendix A) or specific "how to" instructions (Appendix B) was BCBST informed that

19. *Kuritzky v. Blue Shield of Western New York, Inc.,* 850 F.2d 126, 128 (2d Cir.1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 787, 102 L.Ed.2d 778 (1989) (citing *Ass'n of Seat Lift Manufacturers v. Bowen,* Medicare and Medicaid Guide (CCH) § 36,110, at 13,468 (N.D.Ohio Jan. 30, 1987); *Mobile Medical Services, Inc. v. Arkansas Blue Cross and Blue Shield,* 676 F.Supp. 194 (W.D.Ark.1987). *See generally Medical Fund–Philadelphia Geriatric Center v. Heckler,* 804 F.2d 33, 36–39 (3d Cir.1986)).

20. A "method" is the Secretary's regulatory scheme for benefit payments, and challenges to that regulatory scheme are judicially reviewable because a carrier hearing officer does not have the power to countermand the Secretary's regulations.

21. As stated before, BCBST had this data but its computers were not capable of retrieving it for use in determining the reasonable charges for the 18 new procedure codes.

22. Sometimes the use of customary and prevailing data and other standard criteria prescribed by 42 C.F.R. § 405.502(a) results in too high or low a fee schedule. In such an instance, HCFA or BCBST can, with established limits, establish a "special reasonable charge limit" or set a fee in order to avoid "grossly deficient or excessive charges." 42 C.F.R. § 405.502(a)(7) and (g).

23. For the full text of these instructions, see Appendix B.

the statewide fees are illegal. Instead BCBST was requested to load valid customary and prevailing data from old 4–digit codes into the new 5–digit HCPCS code. Where HCFA was uncertain about the existence of valid customary and prevailing data for an old code, it told BCBST to load or input any such existing data or alternatively to leave the set fee and make sure the Economic Index had been applied.

Read in a vacuum the Secretary's instructions may appear to take away the carrier's discretion with respect to determining the reasonable charges for various procedures. But read in the context of the relevant statutes, regulations and the BCBST contract with HCFA, these instructions merely advise BCBST to obey the law by applying available valid customary and prevailing data to the new HCPCS codes.

We cannot agree with TMA that through these HCFA advisory instructions the Secretary has declared the use of the set statewide fees illegal, and thus promulgated a new regulation or instruction which would have binding effect on any related amount determination requiring HO review. TMA mischaracterizes the HCFA direction for in the event that no valid customary and prevailing charge data was available, the set statewide fees were to be retained. Also, until the valid customary and prevailing data was matched to a relevant procedure code, no one could know whether a skewed ("grossly deficient or excessive") figure would result thus enabling BCBST to set a fee pursuant to 42 C.F.R. § 405.502(a)(7) and (g).

In this instance, HCFA is clearly acting within its oversight role. In its general oversight role HCFA "assur[es] that Carriers apply pertinent statutes, regulations, and instructions in making such [reasonable charge] determinations, and br[ings] pertinent information to the Carrier's attention for use in carrying out these responsibilities." *Ass'n of Seat Lift Manufacturers v. Bowen,* 858 F.2d 308, 315 (6th Cir.1988). In this instance HCFA was monitoring BCBST's conversion to the new 5–digit "national" HCPCS codes. HCFA audited BCBST and determined that the conversion process had not been properly completed—specifically, due to the limitations of BCBST's computer system capability, valid customary and prevailing data could not be cross-walked to the 18 new HCPCS codes. BCBST decided to handle this problem by setting a statewide fee for the 18 procedure codes—a decision which HCFA in carrying out its oversight responsibility informed BCBST was contrary to the proper implementation of the conversion from old to new codes.[24]

Our review of the record convinces us that the HCFA directions regarding the appropriate use of set statewide fees and the need to take into consideration valid customary and prevailing data for the 18 new procedure codes are not regulations or "instructions" which would bind a HO to find the use of the set statewide fee to compute the disputed payments to the physicians and patients were *per se* illegal, and therefore possibly not subject to judicial review under 42 U.S.C. § 1395ff.

### (ii) The Rx: Decision to Reopen

We now move to the question of whether HOs could make an independent determination on a claim-by-claim basis of the merits of the decision to reopen the payments for the 18 procedure codes originally made in accordance with the set statewide fees. The record shows that after considering the newly loaded valid custom-

---

**24.** We find it significant that HCFA limited its directions and advice to a discussion of proper handling of the conversion project and the generalities of setting fees. HCFA did not purport to determine reasonable charges for the carrier, nor did HCFA tell BCBST that after properly cross-walking or loading the valid customary and prevailing data that it could not opt to set a statewide fee for a given procedure code. (BCBST was told to first consult HCFA which we interpret to be no more than a cautionary statement to the effect that "you must obey the law.") Thus, as in *Seat Lift Manufacturers,* the correspondence from HCFA to the carrier did not instruct the carrier how to derive the allowable reasonable charge for a particular item or service. Although the letters in the instant case may give stronger advice than the memoranda in *Seat Lift Manufacturers,* this stronger advice was directed toward implementation of the coding system and had only incidental impact on reasonable charge determinations.

ary and prevailing charge data, BCBST dropped the set statewide fees. Since the previously set statewide fees exceeded the payments calculated using the previously irretrievable customary and prevailing charge data, BCBST was faced with a large overpayment which had been made to physicians and patients from approximately July 1985 to March 1986. In August 1987, more than a year after BCBST stopped using the set statewide fees for the 18 procedure codes, BCBST sent letters to physicians and beneficiaries seeking recoupment of the overpayment. The letters to the physicians stated that HCFA had instructed Blue Cross to recover the overpayments made for the 18 procedure codes.

Under the TMA theory that correspondence between HCFA and BCBST concerning the decision to reopen the payment determinations constitutes binding "instructions" from the Secretary and thus are judicially reviewable because they stand outside the purview of meaningful HO review, we culled the record for the text of these instructions. Finding only letters describing the project to determine whether recoupment should be sought, we requested counsel to submit any and all letters and correspondence from "the Secretary or HCFA which instruct Blue Cross to reopen the claims, proceed with collection refunds, etc." Letter to Counsel of Record, Jan. 30, 1989.[25] Since this case is ongoing in district court and developments there consistent with this opinion might be decisive, we were looking for communications which by their terms would constrain a putative HO from determining that the Secretary or HCFA had ruled on the merits of any such reopening. This would include the question of whether the reopening was timely since initial payment determinations can only be reopened 12–48 months later if "good cause" exists for the reopening. 42 C.F.R. § 405.841(b).[26] Three events give rise to a finding of good cause: (i) discovery of new and material evidence not considered in the initial determination,[27] (ii) clerical error, or (iii) "an error on the face of the evidence on which such determination or decision is based." 20 C.F.R. § 404.958, MCM § 121007.

The trial court in determining the 4th criteria of TMA's likelihood of prevailing on the merits [28] held that the Secretary and

---

**25.** Our request was based on TMA's representation at oral argument that such documents had subsequently been produced in the course of the on-going litigation of the permanent injunction. For a summary of the correspondence and letters submitted, see n. 29, *infra.* In our letter to counsel we reserved judgment on whether documents not specifically a part of the record of the preliminary injunction case but a part of the record in the district court may be used in this court's review of the preliminary injunction. Although our request for supplemental documents may seem odd, at best, we concluded that jurisdiction, like a F.R.Civ.P. 12(b)(6) motion is a matter in which potential evidence, even if ultimately inadmissible at trial, can be considered for purposes of disposing of the issue at hand. *See* 2A *Moore's Federal Practice,* ¶ 12–09[3]. The burden before the trial court was on TMA as plaintiff to sustain its contention that the HO would be disqualified because the HO was under binding instructions from the Secretary or HCFA that would bar review by the HO. Only by making good on this contention would the district court have jurisdiction of the case. If the record is insufficient to support jurisdiction as such, then the district court erred. In this instance, TMA was effectively given a second chance to furnish documents constituting binding Secretary of HCFA instructions to reopen which would support jurisdic-

tion. (Since we are not umpiring a baseball game, we need not wait for a third strike before calling TMA "out.") The Secretary did not object to our request, but responded that no documents—including those submitted by TMA—existed to establish TMA's contention. Since our thorough review of those documents leads us to agree with the Secretary that TMA's supplemental documentation fails to sustain jurisdiction, in effect we have simply not used non-record material.

**26.** Section 405.841 provides in pertinent part:
An initial ... determination of a carrier ... may be reopened by such carrier ...
....
(b) After such 12–month period [from the determination], but within 4 years from the date of notice of the initial determination to the party of such determination, upon establishment of good cause for reopening such determination....

**27.** For the definition of new and material evidence, see MCM § 12100.8A.

**28.** This determination was made during the court's analysis of whether TMA had established the first of the four prerequisites to the grant of preliminary injunction. *Canal Authority of*

BCBST had not established any of the three criteria for a good cause for reopening. 678 F.Supp. at 648–49. The very analysis of the trial court exemplifies the intrusion by a federal court into the process of exclusive determination by a HO, free of binding contrary instructions, of the issue of timeliness and good cause. Nothing in the trial court's detailed analysis discusses or describes an "instruction" of HCFA or the Secretary which would command a HO to reject a claim or defense by a physician or patient that BCBST lacked good cause to reopen the payment determinations. Our thorough review of the record and the supplementary documents provided by counsel [29] also fails to disclose any Secretary or HCFA communication instructing BCBST to reopen all claims come

hell or high water, or in more austere traditional language stating that the Secretary (or authorized subordinate) had made an advance predetermination—binding on a HO—that good cause supported the belated reopening of any and all individual claims. Absolutely nothing in the record or supplementary documentation furnished by counsel shows that the Secretary made any interpretation of the regulations or imposed any binding instruction either supporting the existence of "good cause" to reopen the collective or individual claims of the physicians and patients or deciding any other factor on the merits.

We conclude that whether good cause existed is a matter for independent determination by the HO, and thus is a matter

---

*Florida v. Callaway,* 489 F.2d 567, 572 (5th Cir. 1974). *See also* n. 13, *supra.*

**29.** The numerous documents in the official record on appeal from the preliminary injunction related primarily to the HCFA decisions as to whether it would be economically feasible to collect the overpayment and liaison with BCBST in terms of evaluating the feasibility of recoupment. These documents do not relate to an instruction or order to reopen the claims.

TMA's supplemental documentation falls into 3 groups: (i) written communications from HCFA to BCBST; (ii) HCFA internal memoranda summarizing and referring to meetings and directions given to BCBST plus excerpts of the deposition of J.D. Sconce, Regional Administrator of HCFA; and (iii) material (a deposition and letter) which confirm that HCFA directed BCBST to initiate the recoupment of overpayments. TMA's Index of Supplemental Documents Provided to the Court is reproduced in Appendix C. (Documents marked with an asterisk [*] were already part of the Record on Appeal.) These documents are included in the Appendix E, not published but filed with this opinion.

Documents in Group (i) focus on the identification and collection of overpayments and offset procedures for overpayments which were not voluntarily refunded. The 10/5/87 letter from Regional Director Sconce to BCBST expressly states that it constitutes " 'one time only' instructions" applicable to recoupment efforts directed to beneficiaries. These instructions are confined to "equitable waiver determinations" in instances where beneficiaries request waiver of repayment of $200 or less. Finally, in Group (i) are two sets of "Texas Blue Shield Instruction" which cover the "Processing the Beneficiary–Recovery Reasonable Charge Reduction

Overpayments." TMA concedes that it is unclear when these instructions were sent to BCBST. Nonetheless, the absence of any mention of the propriety of the reopening of the payments indicates that these instructions assume that no obstacle impedes the reopening of the claims.

Viewing Group (i) as a whole, no statement is made by any HCFA official that "good cause" as used in 42 C.F.R. § 405.841(b) (*see* n. 26, *supra*) supports the reopening of the claims nor is any reference made to "good cause" as a possible factor or defense. Similarly, Groups (ii) and (iii) also lack any hint that HCFA has made a finding of "good cause" which would compel a HO to hold that the Secretary through a subordinate had issued a binding interpretations or instructions that "good cause" existed so that the reopening of each and every claim made under the 18 procedure codes from July 1985 to March 1986 was proper. What the documents do show is that HCFA, in its oversight role, told BCBST to initiate the Overpayment/Recoupment Project and played a supervisory role in the recoupment effort. Although HCFA assisted BCBST with the processing of overpayment claims, it was merely acting in its oversight role and never established or even remotely declared any policies or rules which would be binding on a HO called upon to determine the merits of reopening or deciding any of the individual payment claims.

Although the Secretary provided no additional documentation, BCBST submitted 2 supplemental documents (see Appendix D for identification) pursuant to our request. (These materials are identified in Appendix D and included in unpublished Appendix E.) These documents both related to the change in fees resulting from the use of valid customary and prevailing data for various codes. Neither document sheds new light on the decision to reopen or what the decision on reopening would be.

insulated by 42 U.S.C. § 1395ff from judicial review as so plainly declared in *Michigan Academy* and its progeny.

Since the court was without jurisdiction, the trial court erred in granting a preliminary injunction. We must vacate the preliminary injunction and remand to dismiss the case.

### Outpatient Care

We have determined that § 1395ff precludes federal court review of these challenges to the reopening and calculation of payments under the 18 procedure codes. This means that since we find these challenges are matters which are proper for and within the unfettered capacity of effective HO review, the physicians and beneficiaries have failed on the additional and now superfluous ground of failure to exhaust the administrative remedies before seeking relief from a federal district court.[30]

### David Need Not Slay Goliath

■ We are cognizant, however, that TMA makes persuasive argument that the sheer size and magnitude of the potential claims by physicians and beneficiaries distinguishes this case from routine carrier amount determination by a HO. While this factor does not, as urged by TMA, either permit or lead us to permit judicial review under § 1395ff and *Michigan Academy*, we do emphasize the need for a system to be devised to expedite and consolidate these HO hearings in the reopened claims. We voice the serious hope that a system can be devised with the full collaboration of the Secretary, HCFA and the interested beneficiaries and physicians for (i) a composite type hearing and determination with respect to the nearly universal common issues with a workable subsequent administrative determination of dollars, if any, due from each respondent, (ii) allowing issues (other than dollar amounts) peculiar to each physician and beneficiary to be severed for individual action on the basis of the controlling determinations made in (i). *See Pollgreen v. Morris*, 770 F.2d 1536, 1546 (11th Cir.1985). Although the prospect seems staggering, the experience of busy federal trial courts in today's mass tort and class action cases demonstrates that the challenge can be met by innovative, imaginative collaboration of all interested parties. Such a system would assuredly serve the public interest.

### A Shot for the Doctors

Finally, we also see it fit to assuage the fears of the physicians by assuring them that the six-month time limit which 42 C.F.R. § 405.821(d) places on a party's right to request a hearing is effectively tolled by the filing of the complaint in the district court on October 16, 1987. Given § 405.821's provision that, "[t]he carrier may, upon request by the party affected, extend the period for filing the request for hearing," we urge BCBST, HCFA and counsel representing the physician and beneficiary classes to adopt a uniform deadline of filing hearing requests affording the parties a minimum of 122 days [31] for filing. This 122-day minimum period would commence once this opinion and our judgment becomes final and subject to no further usual review.

We cannot overemphasize the bald faith we are placing, albeit necessarily so, in the Secretary, HCFA and BCBST to prescribe a workable system that will ensure that the magnitude of the potential claims to be

---

**30.** The district court held that the physicians and beneficiaries need not exhaust their administrative remedies because an HO would be barred by 42 C.F.R. § 405.860 from countermanding the so-called instructions of the Secretary. As stated in detail, we find this matter wholly within the realm of permissible, effective HO review. Also we find no pigeon hole for this matter within the four exceptions to the doctrine of exhaustion enunciated in *Patsy v. Florida Int'l University*, 634 F.2d 900, 903–04 (5th Cir.1981), *rev'd on other grounds*, 457 U.S. 496, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982).

**31.** We derive this magic number from the following formula. The six-month period starting August 31, 1987 (the last possible day of initial letter mailing to physicians and beneficiaries) consists of 170 calendar days. Forty-eight of those days elapsed before the complaint was filed (October 18, 1987) leaving 122 days for hearing requests to be filed.

reviewed in the requisite hearing process for all claims of $100 or more [32] and not impede the fundamental fairness due to all physicians and beneficiaries entitled to such review.

The judgment must be vacated and the case remanded for want of jurisdiction.

VACATED AND REMANDED FOR DISMISSAL.

## APPENDIX A

January 22, 1986

Our Reference: DPO-R6-3:MF

CP-COD-TBS

Ms. Lelia Wright

Medicare Division Manager

Blue Cross–Blue Shield of Texas

Post Office Box 660156

Dallas, Texas 75266–0156

Dear Lelia:

On December 17 and 18, 1985, staff from the Division Program Operations conducted a special review of Texas Blue Shield's fee setting process. The review was scheduled as a result of several indications to us that the carrier had set fees for procedure codes when valid customary and prevailing data were available. The purpose of the review was twofold; one, to review the fee setting process in general, and second, to review codes which we had identified as those where fees may have been set incorrectly.

As a result of our review, we are requesting that the carrier immediately initiate action to correct the pricing on the codes identified in Attachment 1. Please submit to us a corrective action plan telling us by what date the carrier expects to remove the fees and reinstate the valid customary and prevailing data.

We are disappointed with the performance of Texas Blue Shield in this area. While we understand that the conversion process was difficult and that there would be a number of areas which would require clean up, we did not anticipate the carrier taking actions which would result in unprecedented increases in Medicare allowables.

When setting fees in the future, if there are valid customary and prevailing data available, do not set a fee without prior consultation with staff in the Regional Office. Also, the carrier should maintain documentation on all fees which are set. This documentation should indicate the reason the fee was set, e.g., no data available; how the EI was applied if pertinent; source of the pricing; and any other material which would be relevant.

When the carrier prices services during the HCPCS update, it should be careful in assigning prices if multiple codes are being translated to a single new code. In addition to looking at RVU's, the carrier should take into account frequency and other factors, i.e., what is the effect of the pricing.

If you have any questions, call Magda Flores at 767–6441.

> Sincerely,
> Lanny S. Day, Chief
> Policy and Technical
> Assistance Branch

bcc:

Steve McAdoo, Onsite Specialist

Jim Reed, DFO

Carl Silvernail, SCOB

Official and Reading Files

DPO/MFlores/mf—D1/15

## APPENDIX B

### ATTACHMENT 1 TO APPENDIX A

*Procedure Codes Which Require Action*

1. 90060—Eliminate fee. Load Valid customary and prevailing data from 1–9005 into this code.

2. 90250—Eliminate fee. Load Valid customary and prevailing data from 1–9025 into this code.

3. 66983—Eliminate fee. Load Valid customary and prevailing data from 2–5620 into this code.

---

32. 42 C.F.R. § 405.801(a).

4. 66984—Eliminate fee. Load Valid customary and prevailing data from 2–5622 into this code.

5. A0220—Eliminate fee. Load Valid customary and prevailing data from 9–6012 into this code.

6. A0223—Eliminate fee. Load Valid customary and prevailing data from 9–6013 into this code.

7. 67908—Eliminate fee. Load Valid customary and prevailing data from 2–5727 into this code.

8. R0070—Eliminate fee. Load Valid customary and prevailing data from 4–7468 into this code.

9. R0075—Eliminate fee. Load Valid customary and prevailing data, if available, in this code.

10. W7451—Eliminate fee. Load Valid customary and prevailing data from 4–7451 into this code.

11. W7453—Eliminate fee. Load Valid customary and prevailing data from 4–7453 into this code.

12. W7460—Eliminate fee. Load Valid customary and prevailing data from 4–7460 into this code.

13. 74000—Eliminate fee. Load Valid customary and prevailing data from 4–7350 into this code.

14. 67143—Eliminate fee. Load Valid customary and prevailing data from 2–5635 into this code.

15. Z9072—Eliminate fee. Load Valid customary and prevailing data from 1–9072 into this code.

16. 51595—Leave on fee. Ensure that the Economic Index has been applied to this procedure.

17. 33460—Determine if the code this converted from profiled in FSY86. If so, compare current fee to this and bring back into line if it is different.

18. 90784—If there were valid customary and prevailing data in the 1–9084, this data should replace the fee. If not, leave the fee and ensure that the EI has been applied.

19. 90798—See above recommendation.

20. 52320—Ensure that the EI has been applied.

21. 95860 to 95864—Leave as is.

22. M0702 to M0710—Ensure that the EI has been applied.

23. 78202—Ensure that the EI has been applied. Otherwise, leave as is.

24. L6250—Leave as is.

25. L6710—Leave as is.

26. 67216—Ensure application of EI. Otherwise, leave as is.

27. 67226—Ensure application of EI. Otherwise, leave as is.

28. 67104—Ensure application of EI. Otherwise, leave as is.

29. 67106—Ensure application of EI. Otherwise, leave as is.

30. 67146—Ensure application of EI. Otherwise, leave as is.

31. 93309 & 76629—Ensure application of EI. Otherwise, leave as is.

32. 99171 to 99174—Compare to RVU × PCF pricing. If it's in line, leave as is. Otherwise, make necessary adjustments.

33. 90640 to 90643—Load the prevailing fee of the appropriate office visit code in each locality and speciality. Leave customaries to default pricing (50th percentile). If this is not feasible, array the prevailing charges for the office visit codes and select the 75th percentile.

### APPENDIX C [1]

#### Index of Supplemental Documents
#### *Provided by TMA* [2]

I. Written communications from the Health Care Financing Administration ("HCFA") to Blue Cross and Blue Shield of Texas, Inc. ("Blue Cross"):

 A.\* Letter of January 22, 1986, from Lanny S. Day, Chief, Policy and Technical Assistance Branch, HCFA, to Lelia Wright, Medicare Division Manager, Blue Cross, requesting immediate prospective changes in pricing, with attachment:

 1. "Procedure Codes Which Require Action", stating in detail the

---

**1.** These documents have been filed with the Clerk as an unpublished Appendix E.

**2.** Items marked with an asterisk (\*) are in the official record of the preliminary injunction.

prospective pricing changes required by HCFA.

B. Correspondence between Blue Cross and HCFA in which Blue Cross requested and HCFA granted permission to delay the Overpayment Project until after "BMAD specifications" became available and referring to budgeting for the Overpayment Project:

1. Letter of March 9, 1987, from Barbara Harvey, Director, Staff Services, Blue Cross, to Magda Flores, Division of Program Operations, HCFA;

2. Letter of March 19, 1987, from Lanny S. Day to Lelia Wright.

C. Letter of July 23, 1987, from Lanny S. Day to Lelia Wright forwarding HCFA-approved letters to be sent by Blue Cross to beneficiaries and physicians:

1. HCFA-approved letter to be sent by Blue Cross to physicians where claims were assigned and where there were no beneficiary co-payment obligations.

2. HCFA-revised and approved letter to be sent by Blue Cross to beneficiaries where claims were unassigned.

3. HCFA-approved letter to be sent by Blue Cross to physicians where claims were assigned and where the beneficiary had co-payment obligations, and

4. HCFA-approved letter to be sent by Blue Cross to beneficiaries where claims were assigned but where beneficiary had co-payment obligations.

D. Letter of August 28, 1987, from J.D. Sconce, Regional Administrator, HCFA, confirming recoupment procedures and enclosing to Lelia Wright:

1. Language to be included in recoupment letters to physicians.

E. Letter dated October 5, 1987, from B.E. McCutcheon, Associate Regional Administrator, HCFA, signing for J.D. Sconce to Lelia Wright, providing instructions pertaining to recovery from beneficiaries and enclosing:

1. A form letter which Blue Cross was instructed to complete for forwarding to beneficiaries in certain cases.

F. "Texas Blue Shield Instructions." (This document was produced by Secretary Bowen in discovery. It is unclear when these instructions were transmitted to Blue Cross. It appears that they were developed by HCFA's Central Office and forwarded to Dallas. See II.C. below.)

G. "Texas Blue Shield Instructions." (This document is similar, but not identical to the document described in I.F., above. See II.D., below.)

II. Internal HCFA documents referring to HCFA's instructions to Blue Cross.

A. Memorandum of May 7, 1987, from Magda Flores to Lanny S. Day, discussing her meeting with Blue Cross personnel.

B. Memorandum of August 28, 1987, from Magda Flores regarding her meeting with Blue Cross and HCFA personnel of the same date and referring to her delivery of HCFA's letter identified as I.D., above.

C. Memorandum of October 14, 1987, from Thomas Castello, Chief, Beneficiary Debt Management Branch, HCFA Central Office, to HCFA's Associate Regional Administrator in Dallas, enclosing "Texas Blue Cross Instructions." (Enclosure provided at I.F., above.)

D. Memorandum of October 21, 1987, from Samuel N. Guida, Director, Division of Overpayment Prevention, HCFA Central Office, to HCFA's Associate Regional Administrator in Dallas, enclosing "final instructions," i.e., "Texas Blue Shield Instructions." (Enclosure provided at I.G., above.)

E. Excerpt of Plaintiffs' deposition of J.D. Sconce, Regional Administrator, HCFA, February 18, 1988.

F. Document prepared by Mr. Sconce's staff to explain the Over-

payment Project (described in Mr. Sconce's deposition).

III. Confirming material from Blue Cross.

 A. Excerpt of Plaintiffs' deposition of Rogers K. Coleman, M.D., Vice President, Medical Director, Blue Cross, February 19, 1988.

 B.* Letter of August 14, 1987, from Dr. Coleman to Louis J. Goodman, Ph.D., describing HCFA's instructions to Blue Cross.

## APPENDIX D [1]

### *Supplemental Documents Submitted by BCBST*

1. March 10, 1986 Letter from Lelia Wright, Division Manager, Medicare, BCBST, to Lanny Day, Chief, Policy and Technical Assistance Branch, HCFA. Describes BCBST's review of pricing problems described in Day's January 22, 1986 letter to BCBST. (Appendix A).

2. March 31, 1986 reply of Day to Wright's letter of March 10, 1986. Day asks to review "the profile build and related data" for two procedure codes.

CLARK, Chief Judge, concurring.

When the Secretary determined that an unauthorized method of calculating payments had been followed, he required the payments to be redetermined by the previously provided method. Although the requirement covered many claims involving a large total number of persons and money, each separate matter related solely to the amount of benefits to be paid on a pre–1987 Part B Medicare claim. On this basis, I concur in the majority's holding that both *Erika* and *Michigan Academy* bar judicial review of the Secretary's requirement and the payment recoupment proceeding.

Because the district court and this court are without jurisdiction, we are also without power or right to comment on the methods or procedures to be followed by the Secretary in the future handling of these claims. I respectfully dissent from

the final three labeled portions of the majority opinion.

1. These documents have been filed with the Clerk as an unpublished Appendix E.