DOWNTOWN MEDICAL CENTER/COMPREHENSIVE HEALTH CARE CLINIC, Plaintiff–Appellee,

v.

Otis R. BOWEN, Secretary of Health & Human Services, Defendant–Appellant.

Nos. 88–2120, 88–2636.

United States Court of Appeals, Tenth Circuit.

Sept. 10, 1991.

Deborah Ruth Kent, Atty., U.S. Dept. of Justice, Washington, D.C. (John R. Bolton, Asst. Atty. Gen., Michael J. Norton, U.S. Atty., Michael Jay Singer and Rick Richmond, Attys., U.S. Dept. of Justice, Washington, D.C., on the brief), for defendant-appellant.

Danielle Lombardo Trostorff, Brook, Morial, Cassibry, Fraiche & Pizza, New Orleans, La. (Lionel Dunievitz, Keller, Dunievitz, Johnson & Wahlberg, Denver, Colo., with her, on the brief), for plaintiff-appellee.

Before HOLLOWAY, Chief Judge, BRORBY, Circuit Judge, and BOHANON, District Judge.*

HOLLOWAY, Chief Judge.

The Secretary of the Department of Health and Human Services (the Secretary) appeals from the district court's grant of summary judgment and award of attorney fees to Downtown Medical Center/Comprehensive Health Care Clinic (CHC). The district court ruled that a hearing officer, acting on behalf of the Secretary, erred as a matter of law in denying CHC reimbursement under the Medicare program for certain psychological and physical therapy services. In awarding attorney fees, the court ruled that the Secretary's defense on the merits was not substantially justified within the meaning of the Equal Access to Justice Act. We reverse.

I.

Title XVIII of the Social Security Act establishes a federally-subsidized health in-

---

* Honorable Luther Bohanon, United States District Judge for the Western District of Oklahoma, sitting by designation.

surance program for persons who are at least 65–years–old or disabled, which is commonly known as the Medicare program. 42 U.S.C. § 1395, *et seq.* (1982 & Supp. III 1985). The Medicare program has two parts: Part A and Part B. At issue here is only Part B.[1] Part B is a voluntary insurance program that covers a portion (ordinarily 80%) of the cost of certain physician services, non-physician services when furnished incident to physicians' services, outpatient physical therapy, and other medical and health care. *Id.* §§ 1395k, 1395*l*(a), 1395x(s). Part B is financed by the Federal Supplementary Medical Insurance Trust Fund. *Id.* § 1395t. The Trust Fund receives moneys from Treasury appropriations and, to a lesser extent, from premiums paid by Part B enrollees. *See Schweiker v. McClure,* 456 U.S. 188, 190, 102 S.Ct. 1665, 1667, 72 L.Ed.2d 1 (1982); 42 U.S.C. §§ 1395j, 1395r, 1395w.

The Secretary is charged with the administration of the Part B program. *See* 42 U.S.C. § 1395kk(a), 1395hh. The claims-processing functions under Part B are handled by private insurance carriers under contract with the Secretary. *Id.* § 1395u(a). These carriers are billed for particular services by program beneficiaries or their assignees (*e.g.,* treating physicians). Upon receiving a bill, a carrier must decide whether the services were medically necessary, whether the charges are reasonable, and whether the claim is otherwise covered. *Id.* § 1395y(a). If the carrier determines that the claim satisfies these criteria, it determines the amount due and makes payment out of the Trust Fund.

Where the claim is denied, one or more opportunities are available under Part B for an appeal. All claimants are initially entitled to a *de novo* written review before another carrier employee. *See* 42 C.F.R. § 405.807. After this review, if they are still unsatisfied and the amount in controversy is $100 or more, claimants are entitled to an oral hearing before a hearing officer designated by the carrier. *See* 42 U.S.C. § 1395u(b)(3)(C); 42 C.F.R. § 405.820. In making their determinations, hearing officers are obligated to comply with the Medicare statute and regulations, "as well as with policy statements, instructions and other guides" issued by the Secretary. *Id.* § 405.860. Among the "guides" issued by the Secretary are the Medicare Carrier's Manual (MCM) and the Outpatient Physical Therapy Manual (OPTM). The hearing officer's decision may be reopened under certain circumstances. *Id.* § 405.841. However, under the language in effect at the time of the instant claims,[2] no provision of the Medicare statute expressly authorizes further review of the hearing officer's decision, including judicial review.

## II.

### A.

CHC is a physician-directed clinic incorporated under the laws of Colorado and authorized by the Secretary to furnish services to patients under Part B of the Medicare Program. With the stated aim of developing a comprehensive health care facility, CHC (through physicians E. Sam and Paul Fishman)[3] subleased portions of its

---

1. The Part A program provides insurance against the cost of certain institutional health services, such as services rendered by hospitals, nursing homes, or hospice facilities. *See Schweiker v. McClure,* 456 U.S. 188, 189, 102 S.Ct. 1665, 1666, 72 L.Ed.2d 1 (1982); 42 U.S.C. § 1395c; 42 C.F.R. § 409.5.

2. In 1986, Congress amended the language of 42 U.S.C. § 1395ff to provide for judicial review of Part B amount determinations, of a type akin to that already available under Part A. Omnibus Budget Reconciliation Act of 1986, Pub.L. No. 99–509, § 9341, 100 Stat. 1874, 2037–38. The amendment only provided for judicial review, however, with respect to services furnished after January 1, 1987. *Id.* § 9341(b), 100 Stat. at

2038. *See generally* Note, *Dollars and Sense: An Introduction to Medicare Part B Appeals,* 25 New Eng.L.Rev. 617, 645–46 (1990). There is no dispute here that the psychological and physical therapy services at issue were furnished prior to this date. Accordingly, the 1986 amendment is not material to our disposition of this case. The language of § 1395ff in effect prior to the amendment is quoted in relevant part *infra* at note 6.

3. The precise nature of the relationship between E. Sam Fishman and Paul Fishman, and CHC is not apparent from the record. At one point before the district court, the Secretary asserted that the Fishmans owned CHC. I R., Doc. 11 at

office space in 1982 to a psychologist and physical therapist. I R., Doc. 7, Ex. 8a–8b. In the sublease agreements, which were virtually identical, CHC sought to regulate the manner in which these professionals furnished services to its patients under referrals. It obligated them to provide only "first-class service," subject to CHC's review, and to communicate with "referring physician(s) and/or other associates" regarding patients with the goal of enhancing the quality of care. *See, e.g., id.* Ex. 8a at 1 n. *. Further, CHC required them to abide by various administrative procedures and policies designed to "enhance the function and professional image and reputation" of CHC. *Id.* at 5. Included among these procedures and policies was a provision stating that assignment of claims under Medicare would be taken and this meant that "only CHC shall bill for such care." *Id.* attachment 1 at 1. CHC did not employ the psychologist or the physical therapist. *Id.* Doc. 8 ¶ 3.

In June 1986, Blue Cross & Blue Shield of Colorado (Blue Cross), a carrier under contract with the Secretary to process Medicare claims in Colorado, informed CHC that it was not entitled to reimbursement under the Medicare program for services furnished by the psychologist and physical therapist to CHC patients in 1984 and 1985, and the payments made to CHC for these services would be subject to recoupment. *Id.* Doc. 7, Ex. 1a at 1–2. Blue Cross said that physicians could not properly bill under the Medicare program for the services of "auxiliary personnel" such as psychologists and physical therapists as an "incident to" their own service unless the physicians employed them. *Id.* at 1. It in-

formed CHC that there was generally a right to review of its decisions before a hearing officer where the amount in controversy was $100 or more. *Id.* at 2. By Blue Cross' calculation, the amount in controversy here was $9,748.22. *Id.* at 2; *id.* Ex. 1b at 2.

CHC sought review of Blue Cross' denial of reimbursement before a hearing officer.[4] The parties waived an oral hearing and the officer rendered her decision on their briefs. The officer ruled against CHC, sustaining the carrier's denial of reimbursement.

The hearing officer addressed two points. First, by reference to the Medicare Carrier's Manual (MCM) §§ 2050, 2050.1 to 2050.2 and 2050.4, she ruled that CHC was not entitled to reimbursement for services furnished by the psychologist and physical therapist because they were not employees of CHC. *Id.* Ex. 3 at 3. More specifically, she stated that physicians could not bill for services of non-physicians who are not in their employ as an "incident to" their services, even if the non-physicians furnished their services under orders from the physicians. *Id.* This was so, she said, because the MCM "requires that physicians only bill Medicare for services that represent an expense incurred by them in their professional practice." *Id.*

Second, the hearing officer ruled that, even if allied health professionals, like psychologists and physical therapists, were not subject to an employment requirement, CHC did not otherwise satisfy the federal standards for reimbursement. *Id.* at 3–5. The hearing officer observed that CHC relied on 42 C.F.R. § 405.1721 for the propo-

---

2. Here, he asserts that they "run" CHC. Brief for Appellant (No. 88–2120) at 8 [hereinafter. Secretary's Brief]. It is clear that the Fishmans were active in the administration of CHC. Further, the Fishmans billed the carrier for the non-physician services at issue under their individual group practice numbers issued by the Secretary. I R., Doc. 7, Ex. 1a–1b; *see* Supplemental Authority at 1 (November 17, 1989) (Letter from CHC to the Clerk of the Court). In its complaint (¶ IV at 2) and appellate brief on the merits (pp. 4–5), CHC makes no attempt to distinguish itself from the Fishmans. And we note that the Secretary has not objected to this action being prosecuted in the name of CHC.

Consequently, we accord the Fishmans no status independent from CHC on this appeal.

4. *See* I R., Doc. 11, Ex. A at 1 (CHC's hearing request, dated July 7, 1987). From the record, it appears that CHC did not first seek a written *de novo* review from a Blue Cross official pursuant to 42 C.F.R. § 405.807. The Secretary, however, does not question the regularity of CHC's initial appeal to the hearing officer; indeed, as noted in text, Blue Cross (the Secretary's agent) pointed the way. Accordingly, we have no occasion to address this procedural point here.

sition that physician-directed clinics can receive Medicare benefits for services furnished by non-employees. However, she said this provision only applied after a clinic had satisfied the criteria of 42 C.F.R. § 405.1701, which related to conditions for participation of clinics in the provision of outpatient physical therapy. *Id.* at 4.

Section 405.1701 incorporated the standards of 42 U.S.C. § 1395x(p)(4)(A)(iv), which established a state licensure requirement. The hearing officer observed that Blue Cross had alleged that CHC was not licensed in Colorado as a physical therapy provider, and CHC had not presented documentation to dispute this point. The hearing officer found that CHC was not a participating provider of outpatient physical therapy services. *Id.* at 5. The hearing officer notified CHC that it could seek to reopen the case to correct alleged mistakes. But, as to the possibility of further review, she commented that: "This decision is final. There are no other appeals you can make." *Id.*

CHC moved for reopening on two separate occasions, and the hearing officer granted each request, responding in writing to CHC's contentions. The hearing officer did not deviate, however, from her ruling against CHC. Significantly, she observed that, even if CHC satisfied the requirements for providing outpatient physical therapy services found in 42 C.F.R. § 405.1701, *et seq.* (subpart Q), reimbursement would not be appropriate because Medicare law imposed additional requirements for providing such services, and there was no showing by CHC that it satisfied them. *Id.* Ex. 5 at 2 (First Reopening). In particular, she referred to the requirements that CHC obtain certification from a state agency that it was in compliance with the conditions for participation in the Medicare program, and execute a provider

agreement with the Secretary. *Id.* (citing § 112 and § 130 of the Outpatient Physical Therapy Manual). *See also id.* Ex. 6 at 2 (Second Reopening).

In addition, the hearing officer rejected an estoppel argument by CHC (found in its first reopening request). *Id.* Ex. 5 at 3–4. CHC contended that the carrier should be estopped from denying its reimbursement claim because CHC informed a carrier representative that it would be providing physical therapy services and the representative indicated that only one Medicare provider number would be necessary, without explaining that "ancillary personnel" would have to be employed by the clinic or physicians to use the number. *Id.* at 3. The hearing officer ruled that "however great or small the asserted deviation from the ideal" by the carrier's representative, it could not estop the government from recouping the overpayment because CHC had not satisfied the traditional elements of estoppel. *Id.* at 4 (citing *Heckler v. Community Health Services*, 467 U.S. 51, 104 S.Ct. 2218, 81 L.Ed.2d 42 (1984)). Accordingly, the hearing officer concluded that her initial decision should stand.

## B.

CHC filed the instant action against Blue Cross and the Secretary in district court. Generally, CHC alleged that the hearing officer's denial of reimbursement for the psychological and physical therapy services was in contravention of Medicare law. It stated that the court had jurisdiction of the action under 28 U.S.C. § 1331, the federal question statute.[5]

The Secretary moved for dismissal as to him for want of jurisdiction under Fed. R.Civ.P. 12(b)(1), and to dismiss as to Blue Cross under Fed.R.Civ.P. 12(b)(6) for failure to state a claim. On his own behalf,

---

5. In addition to the federal question statute, CHC cited a number of other provisions in support of jurisdiction: 42 U.S.C. §§ 405(g) and 1395ff, and 28 U.S.C. § 1361. I R., Doc. 1, ¶ III at 2. In argument before the district court and on appeal, however, CHC has focused almost exclusively on proving the existence of federal question jurisdiction, with reference to the Supreme Court's decision in *Bowen v. Michigan*

*Academy of Family Physicians*, 476 U.S. 667, 106 S.Ct. 2133, 90 L.Ed.2d 623 (1986). *See* Brief on Behalf of Appellee (No. 88–2120) at 9–13 [hereinafter CHC's Brief]; II R. 8. In light of our conclusion below that CHC has successfully established federal question jurisdiction, we need not decide whether jurisdiction could be based on other grounds.

the Secretary argued that federal question jurisdiction over CHC's action was barred by 42 U.S.C. § 1395ff,[6] as construed in *United States v. Erika, Inc.*, 456 U.S. 201, 102 S.Ct. 1650, 72 L.Ed.2d 12 (1982), because CHC sought judicial review of Blue Cross' determination on a payment claim under Part B for particular services. On behalf of Blue Cross, the Secretary argued that the carrier should be dismissed because it was acting on his behalf and was not a real party in interest.

The district judge denied the motion to dismiss with respect to the Secretary and granted it with respect to Blue Cross.[7] As to the Secretary, the judge ruled that the "narrow exception" of 42 U.S.C. § 1395ff did not apply and CHC's action was properly before her. II R. 12. She noted that there was a presumption in favor of judicial review that should be given effect absent the existence of an amount dispute. *Id.* at 7–8, 12. The judge found that more was at issue here than an amount dispute (that is, more than "a question of whether someone is to pay $50 or $200"). *Id.* at 12. She viewed the case as involving a determination of eligibility for reimbursement which entailed an interpretation of regulations and statutes. *Id.* As for Blue Cross, the judge ruled that the Secretary, not the carrier, was the real party in interest and, accordingly, dismissed Blue Cross from the case. *Id.* at 4–5, 11–12.

The parties then filed cross-motions for summary judgment on the reimbursement issue. Following oral argument, the district judge ruled that the hearing officer erred as a matter of law "in the interpretations of whether Plaintiff was entitled to receive reimbursement under the Medicare reimbursement statute, and the accompanying regulations." IV R. 2. She noted that in this "complex area" hearing officers had to be familiar "not just with the [Secretary's] manuals" but also the statute and regulations. *Id.*

Looking to the statute and regulations, the judge said it was clear that physical therapists need not be employees for the services to reimbursable; they may be independent contractors. *Id.* Further, the judge perceived the statute as reasonably providing coverage for psychological services as long as the psychologist held a Ph.D. and acted under a physician's orders, and, in this case, she did not find satisfaction of these requirements to be contested. *Id.* at 3. She noted that there was no state licensing requirement for providers of physical therapy services in Colorado. *Id.* at 2. As for the alleged requirement that a clinic be certified by a state agency as being in compliance with the Medicare program, the judge found that CHC was in fact complying with the Medicare statute and regulations and, therefore, could discern no reason why CHC needed several different certifications to be reimbursed.

---

6. In pertinent part, § 1395ff provides:
 **(a) Entitlement to and amount of benefits**
 The determination of whether an individual is entitled to benefits under Part A or Part B of this subchapter, and the determination of the amount of benefits under Part A of this subchapter, shall be made by the Secretary in accordance with regulations prescribed by him.
 **(b) Appeal by individuals**
 (1) Any individual dissatisfied with any determination under subsection (a) of this section as to—
 (A) whether he meets the conditions of section 426 or section 426a of this title, or
 (B) whether he is eligible to enroll and has enrolled pursuant to the provisions of Part B of this subchapter or section 1395i–2 of this title, or
 (C) the amount of benefits under part A of this subchapter (including a determination where such amount is determined to be zero)

 shall be entitled to a hearing thereon by the Secretary to the same extent as is provided in section 405(b) of this title and to judicial review of the Secretary's final decision after such hearing as is provided in section 405(g) of this title.
 (2) Notwithstanding the provisions of subparagraph (C) of paragraph (1) of this subsection, a hearing shall not be available to any individual by reason of such subparagraph (C) if the amount in controversy is less than $100; nor shall judicial review be available to any individual by reason of such subparagraph (C) if the amount in controversy is less than $1000.
 42 U.S.C. § 1395ff(a)–(b) (1982 & Supp. III 1985).

7. CHC did not appeal the dismissal of Blue Cross from the litigation.

*Id.* at 2–3. Accordingly, the judge granted summary judgment in favor of CHC, and the Secretary appealed (No. 88–2120).

The district judge observed that this case appeared to warrant an award of attorney fees under the Equal Access to Justice Act (EAJA), 28 U.S.C. § 2412(d)(1)(A) (1982 & Supp. III 1985). CHC submitted a motion and affidavits in support of such an award, and the court granted the motion in part and denied it in part. It held that CHC was entitled to attorney fees based on the Secretary's defense on the merits, which was not substantially justified within the meaning of the EAJA. No attorney fees were awarded based on the Secretary's challenge to the court's jurisdiction. In finding this challenge to be substantially justified, the court noted, *inter alia,* that 42 U.S.C. § 1395ff was "an ambiguous provision capable of more than one reasonable interpretation." I R., Doc. 20 at 3.

The Secretary moved for reconsideration. He alleged that the judge had misapplied the substantially-justified standard, and that the award of attorney fees was flawed, in any event, because it compensated CHC's counsel at a rate in excess of the usual $75 per hour maximum under the EAJA, 28 U.S.C. § 2412(d)(2)(A), and no special factors justified exceeding this figure. The judge found that she had properly applied the substantially-justified standard but agreed with the Secretary that the rate of compensation initially granted was not warranted. She reduced the award to reflect payment at the $75 per hour rate and entered judgment. I R., Doc. 22 at 4. The Secretary appealed (No. 88–2636).[8]

### III.

 The Secretary initially contends that the district court's summary judgment ruling on the merits in favor of CHC cannot stand because the court lacked subject matter jurisdiction. This is a question of law reviewable *de novo* on appeal. *See Thomas Brooks Chartered v. Burnett,* 920 F.2d 634, 641 (10th Cir.1990); *Community*

*Action of Laramie County, Inc. v. Bowen,* 866 F.2d 347, 351 n. 1 (10th Cir.1989). The Secretary contends that judicial review of CHC's claim under Part B was barred by 42 U.S.C. § 1395ff because the claim constituted a challenge to Blue Cross' determination of the proper reimbursement amount. He notes that § 1395ff's bar against judicial review of Part B amount determinations was intended to preclude more than "those Part B claims that involved mathematical or computational errors." Brief for Appellant (No. 88–2120) at 15 n. 10 [hereinafter Secretary's Brief]. It was allegedly intended as well to preclude review of claims arising from carrier determinations that the proper reimbursement amount is zero due to the absence of Medicare coverage. According to the Secretary, CHC's claim arises from just such a zero-reimbursement determination by Blue Cross and there was no jurisdictional basis for the district court's review. We must disagree.

### A.

Section 1395ff does not expressly preclude judicial review of Part B amount determinations. Instead, without mention of such determinations, § 1395ff affirmatively states that certain matters are the proper subjects of review. *See supra* note 6. Specifically, the statute provides for judicial review of the Secretary's determinations of eligibility under Parts A and B (*i.e.,* whether the purported enrollee is at least 65–years–old, or disabled), and his determinations of "the amount of benefits under Part A." 42 U.S.C. § 1395ff(b)(1)(C). However, in the context of the "precisely drawn provisions" of § 1395ff, the Supreme Court in *United States v. Erika, Inc.,* 456 U.S. at 208, 102 S.Ct. at 1654, concluded that judicial review of Part B amount determinations was implicitly barred.

At issue in *Erika* was a challenge by a major supplier of kidney dialysis machines to the "reasonable charge" established for

---

**8.** CHC did not appeal from the district judge's denial of attorney fees with respect to the Secretary's jurisdictional challenge, nor did it appeal

from the reduction of its fee award based on the Secretary's defense on the merits to reflect payment at the rate of $75 per hour.

its machines by the carrier based on its interpretation of the Medicare statute and regulations. *Id.* at 204, 102 S.Ct. at 1652. In holding that the Court of Claims was without jurisdiction, the Court in *Erika* found the absence of a provision authorizing judicial review of the Secretary's determinations of the amount of allowable Part B benefits to be "persuasive evidence that Congress deliberately intended to foreclose further review of such claims." *Id.* at 208, 102 S.Ct. at 1654. It noted that the legislative history of the Medicare statute lent "unambiguous[ ] support" to this reading of § 1395ff. *Id.* at 211, 102 S.Ct. at 1655. The Court observed that it was Congress' expressed belief that claims under the Part B insurance program (in comparison with claims under Part A) would generally involve small amounts, and that the preclusion of judicial review with respect to such claims was thus desirable, so as to avoid flooding the federal courts with minor matters. *Id.* at 209–11, 102 S.Ct. at 1654–55. Accordingly, in conformity with Congress' intent, the Court found that § 1395ff barred judicial review of plaintiff's claim.

One question left open by *Erika*, however, was whether § 1395ff's bar against judicial review of Part B amount determinations extended to all claims affecting the amount of benefits payable under Part B, even claims alleging violations of the Medicare statute or the Constitution. In *Bowen v. Michigan Academy of Family Physicians*, 476 U.S. 667, 106 S.Ct. 2133, 90 L.Ed.2d 623 (1986), the Court answered this question in the negative. There an association of family physicians and several individual physicians asserted a statutory and constitutional challenge to the validity of a regulation promulgated by the Secretary under Part B, which authorized the payment of benefits in different amounts for similar physician services. Agreeing with the trial court and the court of appeals, the Supreme Court held that judicial review of plaintiffs' claims was not barred by § 1395ff, and that the federal question statute (28 U.S.C. § 1331) provided a proper ground for jurisdiction. 476 U.S. at 678, 679–81, 106 S.Ct. at 2140, 2140–41.

At the threshold, the Court in *Michigan Academy* acknowledged the "strong presumption" that Congress intends to permit judicial review of agency action. *Id.* at 670, 106 S.Ct. at 2135. It ruled that the statutory scheme of the Medicare statute, and in particular § 1395ff, did not speak to the plaintiffs' statutory and constitutional challenge, which it described as a challenge to "the *method* by which such [Part B] amounts are to be determined rather than the *determinations* themselves." *Id.* at 667, 106 S.Ct. at 2133 (emphasis in original). The Court noted that carrier hearing officers, who were expressly authorized to decide cases under Part B, were not permitted to question the legality (constitutional or otherwise) of the Medicare statute and regulations. *Id.* at 675, 676 & n. 6, 106 S.Ct. at 2138, 2138 & n. 6. As evidenced by the statute's terms and legislative history, it was not subject to dispute, said the Court, that Congress assigned to these hearing officers the task of determining with finality challenges to determinations of the amount of Medicare benefits to be paid on particular claims. *Id.* at 678, 106 S.Ct. at 2140. However, the Court concluded that "those matters which Congress did *not* leave to be determined in a 'fair hearing' conducted by the carrier—including challenges to the validity of the Secretary's instructions and regulations—are not impliedly insulated from judicial review" by § 1395ff. *Id.* (emphasis in original).[9]

---

9. In upholding jurisdiction under the federal question statute, the Court in *Michigan Academy* rejected an argument to the contrary premised on 42 U.S.C. § 405(h). 476 U.S. at 678–81, 106 S.Ct. at 2140–41. Section 405(h), which codifies § 205(h) of the Social Security Act, is incorporated into the Medicare statute by 42 U.S.C. § 1395ii. It expressly forecloses judicial review under 28 U.S.C. § 1331 of actions "arising under" the Medicare statute. The Court in *Michigan Academy* noted initially that the effect of

applying § 405(h) would be to provide no forum at all for the adjudication of statutory or constitutional challenges to the Secretary's regulations under Part B. *Id.* at 678, 106 S.Ct. at 2140. It concluded that the bar of § 405(h) was not implicated where the Part B action involved a challenge to the validity of the Medicare statute or regulations (*i.e.*, a "method" challenge). *Id.* at 680, 106 S.Ct. at 2141. The Court observed that the legislative history of the Medicare statute provided specific evidence of Con-

*Erika* and *Michigan Academy* occupy opposite ends of a jurisdictional continuum. *See American Ambulance Service v. Sullivan,* 911 F.2d 901, 905 (3d Cir.1990). On the *Erika* end are nonreviewable challenges to amount determinations, and on the *Michigan Academy* end are reviewable challenges to the method of arriving at amount determinations. Absent consideration of the rationale of *Michigan Academy,* the line of demarcation between amount challenges and method challenges may be unclear. *See, e.g., United States v. Ruegsegger,* 702 F.Supp. 438, 447–48 (S.D.N.Y.1988). As the Fifth Circuit noted: "It is crucial to go beyond semantics because all challenges to Part B benefit determinations can be recast as reviewable challenges to methodology since all awards of Part B benefits or payments are based on a method of calculation." *Texas Medical Ass'n v. Sullivan,* 875 F.2d 1160, 1165 (5th Cir.1989), *cert. denied,* 493 U.S. 1011, 110 S.Ct. 573, 107 L.Ed.2d 568 (1989).

Guided by the *Michigan Academy* rationale, in *Kuritzky v. Blue Shield of Western New York, Inc.,* 850 F.2d 126 (2d Cir. 1988), *cert. denied,* 488 U.S. 1006, 109 S.Ct. 787, 102 L.Ed.2d 778 (1989), the court sketched this line of demarcation in substantive terms. It noted: "The distinction that emerges from *Erika* and *Michigan Academy* is that federal jurisdiction exists where there is a challenge to the validity of an agency rule or regulation, but jurisdiction is lacking where the claim is merely that the insurance carrier misapplied or misinterpreted valid rules and regulations." 850 F.2d at 128 (citations omitted). The term "method," from this perspective, "does not mean the carrier's method of applying the regulations, which *Erika* held was unreviewable; rather, it means the method set forth in the Secretary's regulatory scheme that prescribes how the carriers are to calculate benefits." *Id.*

**B.**

We must carefully consider the basic nature of CHC's contentions on the merits as presented to the district judge. *American Ambulance,* 911 F.2d at 903; *see Medical Fund–Philadelphia Geriatric Center v. Heckler,* 804 F.2d 33, 38, 39 and n. 4 (3d Cir.1986). We begin with an examination of the general averments of the complaint, *see, e.g., Pan American Petroleum Corp. v. Superior Court,* 366 U.S. 656, 662, 81 S.Ct. 1303, 1307, 6 L.Ed.2d 584 (1961), and, under the circumstances of this case, seek clarification as to the nature of CHC's contentions in the arguments of counsel. *See Hadley Memorial Hosp., Inc. v. Schweik-*

gress' intent to foreclose judicial review of only amount determinations, which members of Congress characterized as "quite minor matters." *Id.* (quoting 118 Cong.Rec. 33992 (1972) (remarks of Sen. Bennett)). And yet, even with respect to these matters, Congress saw fit to provide for some form of review, specifically, review before the carrier. The Court declined to "indulge the Government's assumption" that as to all "substantial statutory and constitutional challenges to the Secretary's administration of Part B" Congress intended to provide no forum at all. *Id.*

Prior to *Michigan Academy,* we arrived at a different conclusion under Part A regarding the availability of federal question jurisdiction. *Hadley Memorial Hosp., Inc. v. Schweiker,* 689 F.2d at 909–10. In *Hadley,* we held that § 405(h) barred federal question jurisdiction over an action by Medicare providers challenging the validity of a regulatory formula promulgated by the Secretary for reimbursement of costs of malpractice premiums. *Id.* Guided by the Supreme Court's decision in *Weinberger v. Salfi,* 422 U.S. 749, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975) (finding no federal question jurisdiction where plaintiff asserted a constitutional challenge to a statute governing allowance of certain social security benefits), we interpreted plaintiffs' challenge to the validity of the Secretary's regulatory formula (what might be termed today a "method" challenge) as "arising under" the Medicare statute. We need not comment on the implications of *Michigan Academy* for *Salfi* and the availability of federal question jurisdiction for Part A method challenges. *Compare McCuin v. Secretary of Health and Human Services,* 817 F.2d 161, 165–66 (1st Cir. 1987) (finding federal question jurisdiction under Part A) *with Frankford Hosp. v. Davis,* 647 F.Supp. 1443, 1446 (E.D.Pa.1986) (rejecting federal question jurisdiction under Part A, with specific reliance on § 405(h)). At least as to Part B method challenges, however, the Court in *Michigan Academy* seems to have effectively limited the scope of *Salfi. See* Kinney, *The Medicare Appeals System for Coverage and Payment Disputes: Achieving Fairness in A Time of Constraint,* 1 Admin.L.J. 1, 93–95, 103–04 (1987) (noting that *Michigan Academy* has "wrought a significant erosion of the section 205(h) jurisdictional bar").

*er*, 689 F.2d 905, 907 & n. 2 (10th Cir. 1982).[10]

CHC averred in its complaint that the hearing officer's determination was "in contravention of the law" because reimbursement was available under the Medicare statute and regulations, and the Medicare Carrier's Manual (MCM). I R., Doc. 1, ¶ XIII at 4. More specifically, CHC averred the following: that the Secretary's conclusion (through Blue Cross) that the physical therapy services were not covered, and thus not compensable under Medicare, was "erroneous, contrary to law, and not supported by substantial evidence"; that "the hearing officer misinterpreted the regulations pertaining to clinics and allied health professionals" (noting in this context that CHC "submitted to the hearing officer pertinent regulations which clearly allow the reimbursement of these services rendered"); and, with apparent reference to the provision of outpatient physical therapy services, that the hearing officer incorrectly determined that CHC had not met the conditions for participation, had not received Medicare certification as a provider, and had not entered into a separate participation agreement. *Id.* ¶ XII at 3–4. As a final matter, CHC averred that it "challenge[d] the method employed by defendant[ ] in reaching its determination of denial of benefits." *Id.* ¶ XIV at 4.

We need not determine whether each of CHC's averments states a method challenge. Incorporating and clarifying these averments, CHC advanced two principal contentions for relief before the district judge. First, as to psychological and physical therapy services, CHC argued that the hearing officer erred in predicating her decision on the MCM provisions (*e.g.*, MCM § 2050.2), which provided that a physician-directed clinic must employ psychologists and physical therapists in order to bill for their services to clinic patients. Such an employment condition, it said, was contrary to the Medicare statute and regulations, which did not expressly impose such a condition for reimbursement in cases like this one, where the psychological and physical therapy services were rendered as an "incident to" a physician's professional service. The MCM provisions, said CHC, were no more than interpretive guidelines; to the extent that they imposed the conflicting employment condition, they were invalid.

Second, as to physical therapy services CHC argued that, irrespective of whether the services at issue were "incident to" a physician's professional service, the Medicare statute and regulations expressly contemplated that outpatient physical therapy could be provided by a physician-directed clinic under contractual arrangements with non-employees. CHC asserted that the statutory provisions authorizing clinics to furnish physical therapy services to outpatients "under an arrangement" with others were separate and distinct from the statutory provisions authorizing clinics to furnish such services "incident to" a physician's service (*i.e.*, 42 U.S.C. § 1395x(s)(2)(A)). As the prime example of the "under an arrangement" provisions, CHC cited 42 U.S.C. § 1395x(p). From CHC's perspective, the hearing officer's asserted employment requirement, which was derived from the statutory "incident to" language, was not dispositive on the reimbursement issue. CHC advanced these same arguments in seeking reimbursement for the psychological services, alleging that these services were "analogous" to physical therapy services and should thus be reimbursed on the same terms.[11]

---

**10.** Under *Michigan Academy* and its progeny, we must carefully consider the substance of a plaintiff's allegations in deciding whether federal question jurisdiction is barred by § 1395ff. That is, we must carefully consider whether plaintiff's challenge is directed at the Medicare statute or regulations, or the carrier's interpretation of this law. In part, the general averments of CHC's complaint do not provide fertile ground for such a demanding inquiry. In *Hadley, supra,* in addition to the general averments of the complaint, we relied on the "common ground in the briefs" to clarify certain factual circumstances bearing on our jurisdictional inquiry (*i.e.,* whether the hospital members of plaintiff associations were "providers of Medicare and/or Medicaid benefits"). 689 F.2d at 907 and n. 2. We similarly rely on the "common ground in the briefs" here to clarify the basic nature of CHC's contentions.

**11.** I R., Doc. 7 at 2 n. 1; *see id.,* Doc. 12 at 3. In this connection, CHC noted that the term "psy-

We believe that both of CHC's contentions fall sufficiently close to the *Michigan Academy* end of the jurisdictional continuum for us to conclude that the district court had subject matter jurisdiction of this action.

As to the first contention, we find strong support for our conclusion in *American Ambulance, supra.*[12] There the Third Circuit held that plaintiff's allegation that provisions of the MCM and a Health Care Financing Administration (HCFA)[13] Regional Letter conflicted with, and impermissibly modified the Medicare statute, presented a challenge to the carrier's method of adjudicating the Part B claims at issue, not a challenge to the claim determinations themselves. 911 F.2d at 903, 908. A hearing officer had determined that plaintiff (an ambulance service provider) was obligated to repay the carrier for Part B benefits it received for providing ambulance services to certain dialysis patients. *Id.* at 902. The officer's determination had rested on the MCM provisions and the HCFA Regional Letter which, read together, specified that ambulance services would only be covered by Medicare if all other means of transportation were "conclusively contraindicated." *Id.* at 904. Plaintiff noted that the statute only required that ambulance services be "medically required," and that all other forms of transportation be "contraindicated." *Id.* at 906. According to plaintiff, the hearing officer had effectively imposed an extra requirement for reimbursement that not only went beyond the express terms of the statute, but was inconsistent with them. *Id.* at 903, 906.

In finding valid district court jurisdiction, the Third Circuit said:

Jurisdiction does not depend upon whether the rule as applied in a particular case renders an invalid result, but rather whether the rule imposes assertedly invalid criteria for the Hearing Officer's determinations. It is the criteria that AASI [plaintiff] challenges, and those criteria are part of the method used by the Secretary in administering claims. Thus, AASI's challenge to the criteria is a challenge to the Secretary's method. *Id.* at 907.

Like the *American Ambulance* plaintiff, CHC's argument was that the hearing officer had imposed an extra condition for reimbursement which was not within the terms of the statute and regulations, but inconsistent with them. This argument does not concern the amount of particular claims but, rather, the method the hearing officer used in denying them. In particular, CHC's challenge here is to the validity of a criterion used by the hearing officer (*i.e.,* the employment criterion). Moreover, it cannot be said that CHC's challenge is of the type left by Congress for adjudication by hearing officers. The employment criterion at issue is stated in MCM provisions, which are "part and parcel of the Secretary's regulatory scheme." *Texas Medical Ass'n,* 875 F.2d at 1165. The hearing officer was bound as a matter of law to follow them in determining whether the psychological and physical therapy services at issue were furnished as an "incident to" a physician's professional service. Thus the district court had jurisdiction over this aspect of CHC's action.

As for the second contention, we also hold that the district judge had jurisdiction. CHC's second argument is not as readily

---

chologist" was defined in the regulations setting forth the conditions of participation for furnishing outpatient physical therapy services by clinics, rehabilitation agencies, and public health agencies, and the psychologist receiving its referrals satisfied this definition. *Id.,* Doc. 7 at 2 n. 1. *See generally* 42 C.F.R. § 405.1702(f) (definition of "psychologist").

**12.** *See also Medical Fund–Philadelphia Geriatric Center v. Heckler,* 804 F.2d 33, 38–39 (3d Cir. 1986); *Linoz v. Heckler,* 800 F.2d 871, 876 (9th Cir.1986); *College of American Pathologists v.*

*Heckler,* 734 F.2d 859, 862–63 (D.C.Cir.1984) (pre-*Michigan Academy* ); *Integrated Generics, Inc. v. Bowen,* 678 F.Supp. 1004, 1008 (E.D.N.Y.1988).

**13.** The Secretary has delegated the tasks of financial and administrative management of the Medicare program to the Health Care Financing Administration. *See generally* Note, *supra* note 1, at 621 (citing Health Care Financing Administration, Pub. No. 03270, Medicare and Medicaid Data Book 55 (1988)).

analogized to *Michigan Academy;* it does not involve a facial challenge to a regulation or instruction of the Secretary, or some criterion embodied therein. However, the second contention may be reasonably construed as a challenge to the validity of the MCM's "incident to" provisions, and in particular the employment criterion, *as applied* to the facts of this case.[14] *See Medical Fund*, 804 F.2d at 39 & n. 4. It was CHC's contention that, irrespective of whether the physical therapy or psychological services were furnished as an "incident to" their physicians' professional service, the Medicare statute and regulations expressly provided the basis for reimbursement for such services (either directly or by analogy), when they were furnished, as here, "under an arrangement" with a physician-directed clinic. In effect, CHC asserted that the MCM's "incident to" provisions, as interpretive guidelines, were invalid to the extent that they were applied to defeat this alleged right to reimbursement otherwise established in the statutes and regulations.

Such an assertion, which challenges the validity of a statute or regulation as applied, falls within the ambit of *Michigan Academy.* As the court observed in *Medical Fund, supra,* an argument,

> which either challenges an explicit HFCA [sic] policy in the Medicare Carrier's Manual *or challenges its lawfulness as applied* to situations like this one, lies outside the jurisdiction of the hearing officer, for it is not within the authority of the hearing officer even to comment upon the legality of policies established by the Secretary or the HCFA.

*Id.* at 39 (emphasis added). Therefore, we hold that the district court's jurisdiction over this second aspect of CHC's action

(and thus the action as a whole) was properly invoked.

## IV.

We turn now to the question whether the district court's ruling for plaintiff on the merits was correct. We review this summary judgment ruling *de novo*, applying the same legal standard under Fed.R.Civ.P. 56 as the district court. *Gonzales v. Millers Cas. Ins. Co.*, 923 F.2d 1417, 1419 (10th Cir.1991). Specifically, we must determine whether there are any genuine issues of material fact and, if not, whether the substantive law was correctly applied. The evidence is viewed in the light most favorable to the nonmovant. *Baker v. Penn Mut. Life Ins. Co.*, 788 F.2d 650, 653 (10th Cir.1986).

At issue here are questions of law. The material facts are essentially undisputed. *See infra* note 16. We must determine whether the hearing officer, in denying CHC's claim, correctly determined that the psychological and physical therapy services at issue were not reimbursable under the Medicare program pursuant to the "incident to" and "under an arrangement" language of the statute and regulations. We conclude that the hearing officer's determination was correct and must disagree with the district judge's contrary ruling.

### A.

#### 1.

■ Our analysis of the "incident to" language begins with a general category of services covered by the Medicare program called "medical and other health services." 42 U.S.C. § 1395k(a)(1). As defined, the term "medical and other health services" includes, not only physicians' services, but

---

14. The circumstances here, therefore, differ markedly from those in *Association of Seat Lift Mfrs. v. Bowen,* 858 F.2d 308 (6th Cir.1988), *cert. denied,* 489 U.S. 1078, 109 S.Ct. 1528, 103 L.Ed.2d 833 (1989), cited by the Secretary. There plaintiffs mounted a challenge to a carrier's determination under Part B of a "reasonable charge" for seat lifts, which was based on application of the "inherently reasonable" criterion of the Secretary's regulations. 858 F.2d at 310, 313–14. Not only did plaintiff not allege

that the Medicare statute or any provisions of the Medicare Carrier's Manual were invalid, but it also did not allege that the carrier was without authority *in that case* to establish allowable charges based on the "inherently reasonable" criterion. *Id.* at 314–15. The Sixth Circuit held that judicial review was barred with respect to plaintiffs' challenge because, "as in *Erika,* only implementation of a method, not the method itself, was at issue." *Id.* at 317. *Seat Lift Mfrs.* and like cases are thus distinguishable.

also "services and supplies ... furnished as an *incident to* a physician's professional service, of kinds which are commonly furnished in physicians' offices and are commonly either rendered without charge or included in the physicians' bills." *Id.* § 1395x(s)(2)(A) (emphasis added). The statute does not provide further details regarding what services and supplies may be considered as furnished "incident to" a physician's professional service. And, on this point, the relevant regulations parrot the general language of the statute. 42 C.F.R. §§ 410.10 and 410.26.

However, the Medicare Carrier's Manual (MCM) elaborates on the content of this language. MCM § 2050.1 states that services and supplies are "incident to" when they are "furnished as an integral, although incidental, part" of the physician's personal professional service "in the course of diagnosis or treatment of an injury or illness." Under this section, non-physicians rendering services must satisfy two conditions: (1) they must render the services under the direct supervision of the physician, and (2) they must be employees of the physician. MCM § 2050.1.

Section 2050.2 (titled *"Commonly Furnished in Physicians' Offices"*) addresses these two conditions at greater length. It describes a category of health care professionals known as "auxiliary personnel" who aid the physician, which includes psychologists and physical therapists. Coverage of services furnished by these auxiliary personnel is "limited to situations in which there is direct physician supervision." MCM § 2050.2.

This section expressly provides that services furnished by auxiliary personnel who are not employees of the physician are not covered as "incident to" the physician's professional service, even if furnished under order of the physician and included in the physician's bill. This is allegedly because "the law requires that the services be of kinds commonly furnished in physician's offices and commonly either rendered without charge or included in physicians' bills." Section 2050.2 notes that a patient's liability for incidental services is

to the physician; "therefore, the incidental services must represent an expense incurred by the physician in his professional practice." *Id.*

Section 2050.4 makes clear that the principles outlined in §§ 2050.1 and 2050.2 regarding when services of auxiliary personnel may be deemed "incident to" a physician's services furnished in a private office setting are generally applicable as well when a physician's services are furnished in a physician-directed clinic. Section 2050.4 cautions in this regard that "[i]f the clinic refers a patient for auxiliary services performed by personnel who are not employed by the clinic, such services would not be incident to a physician's service." MCM § 2050.4.

2.

■ In asserting the employment requirement as a ground for denying CHC's reimbursement claim, the hearing officer relied on the plain language of the MCM, especially MCM § 2050.2. The MCM reflects the Secretary's interpretation of the Medicare statute and regulations. *See Daviess County Hosp. v. Bowen,* 811 F.2d 338, 345 (7th Cir.1987). Such an administrative interpretation is ordinarily entitled to considerable deference unless it is plainly inconsistent with the clear meaning of the statute and regulations or unreasonable. *See Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 844–45, 104 S.Ct. 2778, 2782–83, 81 L.Ed.2d 694 (1984); *Bowles v. Seminole Rock & Sand Co.,* 325 U.S. 410, 413–14, 65 S.Ct. 1215, 1217–18, 89 L.Ed. 1700 (1945); *Public Service Co. v. United States,* 816 F.2d 530, 532 (10th Cir.1987). *See also City of Aurora v. Hunt,* 749 F.2d 1457, 1462 (10th Cir.1984) (noting that "[e]ven if an agency's interpretation is not the only one permitted by the language of the rule, courts must respect it if it is at least a reasonable interpretation").

We believe that the Secretary's interpretation of the Medicare statute and regulations, as embodied in MCM § 2050.2 and related MCM provisions, is reasonable and not inconsistent with the statute and regu-

lations. More specifically, we find that the Secretary could reasonably interpret 42 U.S.C. § 1395x(s)(2)(A) and 42 C.F.R. §§ 410.10 and 410.26 as only authorizing reimbursement under the "incident to" language for psychological and physical therapy services furnished by non-physician personnel when the personnel are employees of the physician. The Secretary's comments with respect to the employment requirement, as stated in the MCM, are persuasive. The health care services of non-physician personnel who are employed by a physician can reasonably be viewed as the kind of services that are commonly furnished in a physician's office (or in the setting of a physician-directed clinic), and included as charges in a physician's bills, just as the services of other employees are commonly performed at the workplaces of their employers and billed to service recipients through the statements of their employers.

The employment requirement is clearly consonant with the physician-billing provision of the statute and regulations. It is reasonable to believe, as the Secretary does, that in order for a physician to properly bill for incidental services under the statute and regulations, the physician must actually incur expenses in connection with the services. Perhaps the most direct, if not the only manner, in which a physician may incur expenses for incidental services furnished by non-physician personnel is where the physician employs them.

In addition, evident on the face of the statute and regulations is Congress' intention that services subject to reimbursement under the "incident to" language be closely tied to the physician's service. As the Secretary suggests, Reply Brief for Appellant (No. 88–2120) at 5–6, the employment requirement protects from reimbursement for incidental services where the relationship between the non-physician provider and the physician was attenuated. Even assuming that CHC physicians were able to maintain a close and productive working relationship with the psychologist and physical therapist pursuant to the sublease agreements, Brief on Behalf of Appellee (No. 88–2120) at 29–30 [hereinafter CHC's

Brief], that fact alone would not render the Secretary's interpretation of Medicare law with respect to the employment requirement unreasonable.

We hold that the Secretary's interpretation of the Medicare statute and regulations here is valid. Accordingly, we agree that reimbursement should be denied because of failure to meet the employment requirement. The hearing officer correctly denied recovery on this ground and the district judge erred in reversing that ruling.

CHC argues to the contrary that Congress has not traditionally understood the "incident to" language as embodying an employment requirement. It primarily relies on a 1977 report issued by the House Ways and Means Committee. H.R.Rep. No. 548, 95th Cong., 1st Sess., pt. 1 (1977), *reprinted in*, 1977 U.S.Code Cong. & Admin.News 4055. This report accompanied H.R. 8422 (enacted with amendments as Pub.L. No. 95–210), which was designed to address the severe problems resulting from the lack of physicians in many rural areas by providing Medicare coverage for physician-type services furnished by non-physician "primary care practitioners" (*e.g.*, physician assistants) in rural health clinics, irrespective of whether the clinics were under the full-time direction of a physician. H.R.Rep. No. 548, *supra*, at 2, 4.

The committee noted that under the Medicare statute, as first enacted, coverage under Part B was generally available for the services of non-physicians furnished "incident to" a physician's service. It found, however, that the "incident to" language did not extend to the services furnished by primary care practitioners in rural health clinics because those services were of a type ordinarily furnished by physicians, and physician supervision of primary care practitioners in rural health clinics was only indirect. *Id.* at 4. In this connection, the committee observed:

Over the years, this "incident to" requirement has been interpreted to mean that two requirements must be met. The first is that there must be direct physi-

cian supervision of the services provided by the non-physician personnel. The second is that the services provided by the nonphysician personnel cannot be physician-type services, that is, they cannot be actual medical services.

*Id.,* U.S.Code Cong. & Admin.News 1977, at 4057.

We find CHC's reference to this legislative material to be unpersuasive. We note, first, that the report is legislative history that occurred subsequent to the enactment of the statutory provisions in question, thus bearing somewhat lesser significance. Further, we discern nothing in this material that bars the Secretary from reading the "incident to" language as embodying an employment requirement. In context, we find no clear indication in the House Ways and Means Committee report that the committee intended its discussion of the term "incident to" to constitute a comprehensive statement of Congress' view of its meaning. The committee's discussion of the "incident to" term is premised on a specific question of coverage, namely, the provision of Medicare benefits for physician-type services furnished by non-physicians. This question is quite different from the one presented here involving the provision of Medicare benefits for *non-physician* services furnished by non-physicians. We are not persuaded that the committee's discussion of the elements (and limitations) of the "incident to" concept as it relates to the former situation is determinative of the elements of that concept as it relates to the latter.

CHC also contends that the Secretary conceded at the summary judgment hearing that psychological services are reimbursable under Part B without an employment relationship with a physician; that, therefore, the Secretary should not be permitted to assert the employment requirement here to bar reimbursement for such services. We disagree.

To be sure, the argument of counsel for the Secretary at the hearing was not a model of clarity. There were statements at argument, relied on by CHC, which emerged during discussion between counsel and the court on § 2070.2. The court was pointing out that payments were made for some services without any employment requirement. In response, counsel for the Secretary did admit that the Secretary was "paying out generally for psychological services when it is a Ph.D. and under the orders of a physician." III R. 27; *see id.* at 15–17.

Thus, at this point, the Secretary's counsel appeared to concede that the employment requirement was not critical. MCM § 2070.2 does permit reimbursement under Part B *without* an employment requirement for "diagnostic services" rendered by a psychologist when ordered by a physician. In our record the only psychological services put at issue are therapeutic services. CHC made no showing before the district judge that diagnostic (as opposed to therapeutic) services were at issue, and CHC has made no assertion to this effect before us.[15]

15. We note that counsel for CHC did have an exchange with the court that at least facially implicated MCM § 2070.2:

THE COURT: Let me ask, because I haven't gone through every detail of every exhibit: As to the psychologist's two questions, first of all—I'm looking now at 2070.2—did the doctor order the testing?

MS. TROSTORFF [CHC's counsel]: Yes, your Honor.

THE COURT: And is that documented?

MS. TROSTORFF: There is a specific exhibit that documents that, although there has been no—was no contest as to whether the physician had ordered that particular testing procedure. That was not a basis for the denial, so that matter never came into issue. The services were originally allowed and would

not have been allowed if there hadn't been a specific physician order. The only reason why there was a reversal of the allowance for those services was because there wasn't an employee/employer relationship, so the fact of whether there was a physician order or not was never an issue.

THE COURT: Are the psychologists all psychologists who hold a doctoral degree in clinical psychology?

MS. TROSTORFF: Yes, your Honor.

III R. 14. We find no assertion in this exchange that the psychological services at issue were diagnostic in nature, of the kind reimbursed under § 2070.2. And no exhibit or other documentation in the record contains such an assertion. CHC's counsel simply responded to the two specific questions put to her by the court;

Lastly, CHC contends that Blue Cross (and thus the Secretary) should be estopped from denying its reimbursement claim because "CHC was advised by its [Blue Cross'] Medicare Provider Relations Representative that it could provide physical therapy and psychological services as a physician directed Medicare clinic" under a single provider number, without being told that under the "incident to" language such auxiliary personnel would have to be employed by the clinic or physicians in order for billing to take place for their services under the provider number. CHC's Brief at 31; *see* I R., Doc. 7, Ex. 4 at 2–3; *id.* Ex. 5 at 3. However, following the clear holding of *Office of Personnel Management v. Richmond,* — U.S. —, 110 S.Ct. 2465, 110 L.Ed.2d 387 (1990), handed down while this case was awaiting decision, we find CHC's contention to be untenable.

In *Richmond,* the Court addressed the question "whether erroneous oral and written advice given by a Government employee to a benefit claimant may give rise to estoppel against the Government, and so entitle the claimant to a monetary payment not otherwise permitted by law." 110 S.Ct. at 2467. Construing the command and the underlying concerns of the Appropriations Clause of the Constitution (Art. I, § 9, cl. 7), the Court answered in the negative, holding that "payments of money from the Federal Treasury are limited to those authorized by statute." *Id.*

*Richmond* is controlling here. The Provider Relations Representative who allegedly provided CHC with incomplete or misleading information was acting on behalf of the Secretary, like the employee in *Richmond.* And, under the Secretary's reason-

able construction of the "incident to" language of the Medicare statute and regulations, reimbursement for the services of auxiliary personnel, like psychologists and physical therapists, was conditioned on the satisfaction of the employment requirement. CHC failed to do so. As we cannot "estop the Constitution," *id.* 110 S.Ct. at 2476, we must reject CHC's contention.

### B.

The Secretary also argues that the hearing officer correctly denied CHC's reimbursement claim for psychological and physical therapy services premised on the "under an arrangement" language of the Medicare statute and regulations. We agree.

With respect to the "under an arrangement" language, we begin our analysis with the general Medicare coverage category called "outpatient physical therapy services." 42 U.S.C. § 1395k(a)(2)(C). Generally, the term "outpatient physical therapy services" means physical therapy services furnished by certain health care institutions, including clinics,[16] or by others "under an arrangement" with such institutions, to an individual as an outpatient, where: (1) that individual is under the care of a physician, and (2) the physical therapy services are furnished pursuant to a plan that is established and periodically reviewed by a physician, and which prescribes the type, amount, and duration of the physical therapy services. 42 U.S.C. § 1395x(p)(1)–(2); *see* 42 C.F.R. § 410.60(a).

To be compensated under the Medicare program for outpatient physical therapy

---

no broader argument regarding the applicability of § 2070.2 is reasonably apparent.

**16.** In the context of outpatient physical therapy, the term "clinic" has a specialized meaning. It means a facility "established primarily for the provision of outpatient physicians' services." 42 C.F.R. § 405.1702(b). Among other things, as a test of physician participation, the regulation specifies that the medical services of a "clinic" must be provided by more than two physicians. *Id.* § 405.1702(b)(1).

On appeal, the Secretary argues that CHC is not a "clinic" within the meaning of § 405.-1702(b) because it is "run by only two doctors."

Secretary's Brief at 21. The Secretary never questioned CHC's "clinic" status before the district judge, however. *See* III R. 20 (the Secretary noting that CHC "was certified as a physician-led clinic"); I R., Doc. 11 at 5 (the Secretary noting that a "physician-directed clinic" like CHC must obtain a special certification from a state agency pursuant to OPTM § 112). Nor did the hearing officer question CHC's "clinic" status in denying reimbursement. Since the matter was not raised below, and we are persuaded to hold for the Secretary on other grounds, we do not treat this question.

services clinics must, *inter alia,* be certified by survey agencies of the states in which they are located as being in compliance with the statutory and other regulatory conditions for participation in the Medicare program, particularly the conditions set out in subpart Q of the regulations. 42 U.S.C. § 1395aa(a); 42 C.F.R. §§ 405.1901(b), 405.1902(a)(1)(i); OPTM § 112. These certifications are transmitted to the Secretary by the survey agencies, and are considered recommendations regarding the eligibility of clinics for program participation. 42 C.F.R. §§ 405.-1901(a), 405.1902(c)(1)(i).

CHC has not satisfied the requirements of the Medicare statute and regulations for furnishing physical therapy services on an outpatient basis "under an arrangement" with others. CHC has conceded that it was not certified by a Colorado survey agency as satisfying the conditions for participation in the Medicare program in its alleged capacity as a provider of outpatient physical therapy services. During the summary judgment hearing, CHC stated: "With respect to the certification issue, the plaintiff has never alleged they [sic] have any special certification. They [sic] are simply certified as a provider, a physician-directed provider under the Medicare program." III R. 25. This statement was in response to the Secretary's assertion that CHC was not "specifically authorized as a provider of outpatient [physical] therapy" services. *Id.* at 19. And, on appeal, CHC put the point more directly: "CHC admits that it is not specially certified to provide physical therapy services under arrangement...." CHC's Brief at 25. This concession by CHC renders its argument for reimbursement under 42 U.S.C. § 1395x(p) and subpart Q untenable. The general certification directive cannot be ignored. *Cf. Splawn v. Schweiker,* 545 F.Supp. 916, 917 (N.D.Tex.1982) (upholding denial of reimbursement for failure to file a provider agreement under Part A). CHC, moreover, has not alleged that the statute and regulations embodying this directive are invalid.

On appeal, CHC nevertheless argues that it need not satisfy any special certification requirement because, as a physician-direct-ed clinic, it furnished the physical therapy services at issue as an "incident to" the physicians' service. CHC's Brief at 25–26. Similarly, at the close of its brief, CHC states: "A physician directed Medicare clinic may provide psychological services and physical therapy services under arrangement as incident to a physician's services." *Id.* at 31.

CHC's position is fundamentally unsound. Specifically, CHC blends together what it itself has recognized are two separate and distinct statutory grounds on which a clinic may seek reimbursement for physical therapy services (and, in CHC's view, for psychological services) that are furnished by others: namely, the "incident to" provisions of 42 U.S.C. § 1395x(s)(2)(A), and the "under an arrangement" provisions of 42 U.S.C. § 1395x(p).

When separately tested against the two statutory grounds, CHC's reimbursement claim fails. It is true, for example, that a clinic may furnish physical therapy services through others as an "incident to" the physician's service without regard to the certification requirement, which operates here to bar CHC's reimbursement claim under § 1395x(p). However, when seeking reimbursement for physical therapy services under the "incident to" language of § 1395x(s)(2)(A), a clinic must satisfy the MCM employment requirement. This, CHC cannot do.

Accordingly, we find that CHC's assertions in support of reimbursement are not convincing. Given its failure with respect to the certification requirement, we need not decide whether CHC was in compliance with the other requirements of the Medicare statute and regulations for furnishing outpatient physical therapy services "under an arrangement" with others. In sum, we agree with the Secretary that reimbursement must be denied to CHC.

## V.

■ In civil actions against the United States not sounding in tort, the Equal Access to Justice Act (EAJA) directs courts to award "a prevailing party other than the

United States fees and other expenses" it has incurred in the action, "unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust." 28 U.S.C. § 2412(d)(1)(A). *See generally Sullivan v. Hudson,* 490 U.S. 877, 883–84, 109 S.Ct. 2248, 2253–54, 104 L.Ed.2d 941 (1989). As defined, the term "fees and other expenses" includes certain reasonable attorney fees. 42 U.S.C. § 2412(d)(2)(A).

The district judge awarded CHC attorney fees under the EAJA based on the Secretary's defense on the merits, finding that the Secretary's position was not substantially justified. On appeal, the Secretary urges us to vacate this award. Given our holding in favor of the Secretary on the merits, this action is clearly appropriate. CHC is not a "prevailing party" on the merits within the meaning of § 2412(d)(1)(A). Under the plain language of the statute, a movant must occupy this status in order to receive an award of attorney fees. Accordingly, we reverse the district judge's attorney fees award under the EAJA.

## VI.

In sum, we hold that the district court had subject matter jurisdiction of this action, but erred in ruling on the merits that CHC was entitled to reimbursement under the Medicare statute and regulations for certain psychological and physical therapy services, and in ruling that the Secretary's defense on the merits was not substantially justified. The judgments in these consolidated cases are REVERSED, and the cases are REMANDED to the district court for the entry of judgments in accord with this opinion.